# UNITED  STATES  DISTRICT  COURT

# SOUTHERN  DISTRICT  OF  GEORGIA

# SAVANNAH  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR418-147 |
| | ) | |
| HERMAN F. WILLIAMS | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Herman Williams is indicted on one count of conspiracy to possess with intent to distribute and to distribute controlled substances (cocaine and marijuana), in violation of 21 U.S.C. § 846.  Doc. 1 at 1-2. According to the Government, the investigation which led to this indictment stretches back as far as 2012.  Doc. 278 at 2.  In 2018, it resulted in the seizure of, among other evidence, 25 kilograms of cocaine and more than $300,000.  Doc. 279 at 2.  Williams is allegedly a principal in this conspiracy.  Doc. 278 at 2 (alleging that the "narcotics network [was] led by Omar Griffin and Herman Williams").  Before the Court are Williams' motions to suppress evidence from seized cell phones (doc. 257) and cell-phone account data (doc. 260).  On January 24, 2019, the Court held an evidentiary hearing on Williams' motions.

First, Williams seeks to suppress the searches of two cell phones; one that he had on his person when he was arrested and one that was discovered in the car in which he fled immediately prior to his arrest. *See* doc. 257 at 3. Although both devices were seized in March 2018, no warrant to search their contents was presented until four months later, in July. *Id.* He contends that "agents' four and a half month delay in obtaining a warrant to search [the] phones was clearly unreasonable, and warrants suppression of the phones and any and all evidence obtained therefrom." *Id.* The Government opposes. Doc. 278.

Williams' second motion seeks suppression of evidence obtained through state-court authorizations of the collection of, among other data, cell site location information. Doc. 260 at 7. He argues further that, if the collection of the data was illegal, then various other evidence becomes "fruit of the poisonous tree." *See* doc. 301 at 16-17. The Government challenges Williams' standing to seek suppression of any information discovered through the authorizations. Doc. 279 at 5-12. Alternatively, it argues that the authorizations were based on probable cause (making them *de facto* warrants). Finally, the Government contends that even if

2

probable cause was lacking, agents acted in good faith reliance on the authorizations' apparent validity.  Doc. 279 at 15-16.

## I.    BACKGROUND

The events leading to Williams' arrest began on March 5, 2018. Doc. 257 at 2.  He and several co-defendants were surveilled at a local restaurant and motel.  *Id.*  As one of his co-defendants left, police initiated a traffic stop and discovered 25 kilograms of cocaine.  *Id.*  Later, police attempted a traffic stop of Williams' car and, as his brief describes it, "following a chase" he was arrested.  *Id.* at 3.  The Government's brief and witnesses' testimony flesh out the details.  After a marked police vehicle attempted a traffic stop, Williams "ran through two stop signs, while driving at a high rate of speed . . . , [he] crashed into a residential yard, immediately got out of the vehicle and took off running."  Doc. 278 at 4.[1] Officers pursued him on foot and apprehended him.  *Id.*  His passenger

---

[1]  The Government has submitted a police helicopter's video recording of these events. *See* doc. 278, Ex. D.  That recording appears consistent with the Government's description.  At the hearing, Officer Brett Minton, who was driving an unmarked vehicle involved in the chase, verified and explained the video's depiction.

also fled and remains a fugitive. *Id.* In a search incident to Williams' arrest, police discovered a "Cricket ZTE cellphone."[2] *Id.*

Chatham-Savannah Counter Narcotics Team (CNT) Officer Brett Minton (who physically apprehended Williams after the foot chase), testified that he discovered the phone in Williams' possession after his arrest, but he did not seize it at that time. In fact, he never seized the phone. After the search confirmed Williams was unarmed, his various items of personal property were returned to him. Minton was not sure exactly when or by whom the phone was taken into police custody, but it may have remained with Williams until he was processed by jail staff. Williams has remained in police custody since his arrest.

CNT Officer Gary Woodruff also testified at the hearing. He assisted in securing the car Williams was driving. He was alerted to the pursuit by radio communications and discovered the black Toyota—he was unsure of

---

[2] Williams' and the Government's briefs are inconsistent in their identification of the cell phones seized. Williams' brief refers to the phone seized from his person as "Device 1," and the phone seized from the car as "Device 14." Doc. 257 at 3. The Government's brief reverses the identification; Device 14 was seized from Williams and Device 1 from the car. Doc. 278 at 4. To avoid confusion, the Court will refer to the devices by the location of their discovery, *i.e.,* the phone seized from Williams and the phone seized from the car. The Government explained the inconsistency in the identification of the devices as the result of a typographical error. Since, as explained below, Williams concedes he lacks standing to challenge the search of the phone seized incident to his arrest and his challenge to the search of the phone seized from the car fails, the inconsistency in the identifications is moot.

the model—unlocked, with its headlights on and engine running.   He impounded the car.   At the hearing, and based on the helicopter video, he identified the car as the same one that Officer Minton observed Williams drive and from which he then fled.

After Williams' arrest, a canine alerted to the presence of narcotics in the vehicle.   Doc. 278 at 4.   The car was impounded and a state search warrant was obtained for its contents.   *Id.*   Upon executing that warrant, police discovered a "grey LG Verizon cellphone."   *Id.*   Williams does not challenge the propriety of the initial seizure of either device.   Rather, he argues that the search of the devices' contents was unreasonable, given that the warrant and subsequent search came more than four months after their seizure.   Doc. 257 at 3-4.

## II.   PHONE SEARCHES

It is clear that "'a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"   *United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).   One way post-seizure police conduct

can render an otherwise reasonable seizure unreasonable is delay.  *Id.*
However, such cases are "often difficult" and require a balancing of
"'privacy-related and law enforcement-related concerns'" to determine
reasonableness.  *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 331
(2001)).  Such a balancing requires the Court to "evaluate the totality of
the circumstances presented by each case."  *Id.*

Implicit in any Fourth-Amendment based challenge, and explicit in
the factors considered to determine whether an otherwise reasonable
search is rendered unreasonable by law enforcement delay, is the question
of the defendant's interest in the object searched.  After all, "Fourth
Amendment rights are personal rights which . . . may not be vicariously
asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).  Thus, "[a]
person who is aggrieved by an illegal search and seizure only through the
introduction of damaging evidence secured by a search of a third person's
premises or property has not had any of his Fourth Amendment rights
infringed."  *Id*.  The principle announced in *Rakas* has come to be known,
for better or worse, as Fourth Amendment "standing."[3]

---

[3]  *Rakas* expresses the Court's doubt about the use of "standing" terminology in this
context.  *See* 439 U.S. at 133 ("[W]e are not at all sure that the determination of a
motion to suppress is materially aided by labeling the inquiry . . . as one of standing,
rather than simply recognizing it as one involving the substantive question of whether

The factors relevant to determine whether a delay renders a search unreasonable include, "the significance of the interference with the person's possessory interest" in the item seized. *Laist*, 702 F.3d at 614 (citing *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009)). The possessory-interest factor is at its nadir when, as here, the defendant is prevented from resuming his possession as a result of his detention. *See United States v. Sparks*, 806 F.3d 1323, 1340 (11th Cir. 2015) ("[I]f the person from whom the item was seized lacks a cognizable possessory interest in the item, that person's Fourth Amendment rights are not violated by even a lengthy period between seizure and the procurement of a warrant."); *United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015) (explaining that the intrusion on detained defendant's possessory interest in seized computer was "minimal" because "[w]here individuals

---

or not the proponent of the motion to suppress has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."). Those doubts notwithstanding, the terminology persists and has become commonplace. *See, e.g., Collins v. Virginia*, ___ U.S. ___, 138 S. Ct. 1663, 1668 n. 1 (2018) (noting that there was no dispute that the challenger "has Fourth Amendment standing."). Despite the terminology, however, courts are careful to distinguish Fourth Amendment from Article III "standing." Fourth Amendment standing is not jurisdictional, it is resolved as an aspect of the merits of the claim. *See, e.g., Presley v. United States*, 895 F.3d 1284, 2190 (11th Cir. 2018) (citing *Minnesota v. Carter*, 525 U.S. 83, 87 (1998); *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014)) ("[U]nlike Article III standing, standing under the Fourth Amendment is not jurisdictional; instead, we analyze it as a merits issue."). As discussed below, *see infra.* n. 6, details of the interaction between Fourth Amendment and jurisdictional (*i.e.* Article III) "standing" remain vexed.

7

are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced." (citing *Seguara v. United States*, 468 U.S. 796, 813 (1984) (Burger, C.J.) (plurality opinion); *United States v. Clutter*, 674 F.3d 980, 984-85 (8th Cir. 2012)); *United States v. Shaw*, 531 F. App'x 946, 949 (11th Cir. 2013) (distinguishing cases suppressing evidence based on unreasonably extended seizure because, among other reasons, the defendant "was in custody throughout the contested delay and concedes he could not have physically possessed the phones")).[4]

At the hearing, Williams conceded he lacked Fourth Amendment standing as to the phone that was discovered on his person.   He

---

[4] *See also United States v. Conley*, 2018 WL 4502180 at * 14 (D. Conn. Sept. 20, 2018) (defendant "had a diminished possessory interest in the cell phone because [he] was detained . . . following the arrest, and [the detention facility] does not permit its inmates to possess cell phones."); *United States v. Boudreau*, 2018 WL 1478037 at * 1 (D.R.I. Mar. 23, 2018) ("[C]ourts have held that a defendant in custody has a more limited possessory interest than an individual not in custody." (*citing Sullivan*, 797 F.3d at 630, 633)); *United States v. Brantley*, 2017 WL 9477669 at * 2 (N.D. Ga. Oct. 17, 2017) (Report and Recommendation), *adopted* 2017 WL 5988833 (N.D. Ga. Dec. 4, 2017) ("Defendant . . . , having been arrested and detained, was not deprived of access to and use of the cellular telephones while in custody."); *United States v. Civil*, 2017 WL 4708063 at * 3 (N.D. Fla. Aug. 1, 2017) ("While *Shaw* may suggest that those in custody have a diminished interest in their property, it does not mean that they lack that interest altogether."); *United States v. Johnson*, 2015 WL 4776096 at *6 (N.D. Cal. Aug. 13, 2015) ("Defendant's possessory interest in the phone was 'virtually nonexistent by virtue of the fact that he remained in custody during the entirety of the cell phone's retention, and never sought its return."); *United States v. Kowalczyk*, 2012 WL 3201975 at * 23 (D. Or. Aug. 3, 2012) ("Since [the defendant] was in custody, there was no evidence that withholding access to his computers and other digital evidence was prejudicial; *he had no serious possessory interest at stake*." (emphasis added)).

maintained his standing, however, as to the phone that was discovered in the car. Given that Fourth Amendment standing is not jurisdictional, the Court assumes, without deciding, that Williams has standing to challenge the search of that phone. He has not, however, established his standing to challenge the search of the phone he was carrying when he was arrested.[5] Williams' request to suppress evidence discovered the search of the phone found on his person, therefore, should be **DENIED**.

Assuming, without deciding, that Williams had a sufficient possessory interest to challenge the search of the phone discovered in the car, the Government has established that he abandoned it. "Fourth Amendment claims do not lie when the defendant has abandoned the searched property." *United States v. Sparks*, 806 F.3d 1323, 1341 (11th Cir. 2015)[6] (citing *United States v. Ramos*, 12 F.3d 1019, 1024 (11th Cir.

---

[5] Although not jurisdictional, Williams' standing to challenge the search of the phone he was carrying is a threshold issue. *See United States v. Jackson*, 618 F. App'x 472, 474 (11th Cir. 2015) (citing *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)) ("The movant's standing to challenge a search or seizure is a threshold issue that the district court must address when ruling on a motion to suppress."). As the movant, Williams bears the burden of establishing his standing. *See, e.g., United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("The individual challenging the search bears the burdens of proof and persuasion" on the issue of standing). As he concedes he lacks standing as to the phone discovered on his person, he has not borne that burden.

[6] *Sparks*, further discussed below, found that an individual who abandoned their property lacked Article III standing to challenge the subsequent search. *See* 806 F.3d

1994); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985)). The determination of abandonment, while not dependent on the technicalities of property law, is objective, and "based primarily on the prior possessor's intent, as discerned from statements, acts, and other facts." *Id.* at 1342. "The critical inquiry when determining whether an abandonment has occurred is 'whether the person prejudiced . . . voluntarily discarded, left behind, or otherwise relinquished his interest

---

at 1340-41 (concluding that defendants' abandonment of personal property deprived the court of "jurisdiction over Defendants' claim that this delay [between seizure and search] violated their Fourth Amendment rights."). In a footnote, the court explained that the analyses of a party's "standing to object to a search—as opposed to standing to object solely to the length of a seizure" are "slightly different[ ]." *Id.* at 1340 n. 14. What the court describes as "standing to object to the search" is the Fourth Amendment concept of "standing." *See id*. (standing to challenge a search depends upon a person's socially recognized expectation of privacy in the object searched). The Court further points out that "[w]here abandonment occurs," an individual lacks the subjective expectation of privacy necessary for Fourth Amendment standing. *Id.* The *Sparks* defendants, therefore, lacked Fourth Amendment standing as well.

    *Sparks* is binding precedent upon this Court. Assuming that the above analysis accurately interprets its standing analysis, it implies that Williams lacks Article-III standing to challenge the delay between the seizure and search of his phone. That finding implies, in turn, that this Court lacks *jurisdiction* to consider his challenge any further. Despite the apparent clarity of *Sparks*, the Court has been unable to identify any other case according abandonment jurisdictional significance, in the Fourth Amendment context. *See Leon*, 468 U.S. at 924 ("Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate."). Fortunately, it appears that in most, if not all cases, *Sparks* implies that a defendant who abandons property surrenders, at least, his Fourth-Amendment standing. Thus, while the Court's alternative analysis may exceed the scope of the issues properly before it, such analysis is, at worst, harmlessly superfluous.

in the property in question.'" *Id.* (quoting *Ramos*, 12 F.3d at 1022).

Particularly relevant here, "'police pursuit . . . does not itself render

abandonment involuntary.'" *United States v. Jefferson*, 451 F. App'x 833,

834 (11th Cir. 2011) (quoting *United States v. Colbert*, 474 F.2d 174 (5th

Cir. 1973)); *see also United States v. Falsey*, 566 F. App'x 864, 867(11th

Cir. 2014) (finding mistaken belief that he was being pursued by police did

not render the abandonment of a car involuntary and collecting cases on

abandonment during flight from police).

The facts of *United States v. Falsey* are very similar to the facts here.

Falsey, mistakenly believing he was being pursued by police, left his car in

a parking lot, with the engine off, but with the keys on the floorboard and

the doors unlocked. *Falsey*, 566 F. App'x at 865.  A witness reported seeing

him flee the car on foot.  *Id.*  Upon impounding the car and conducting an

inventory search, police discovered a locked safe in the trunk, which

contained contraband.  *Id.*  The Court of Appeals found that Falsey's "'. .

. conduct is transparently an abandonment of the tight grip of ownership

and reliance solely on the feeble hope of reacquisition.'" *Id.* at 867 (quoting

*United States v. Edwards*, 441 F.2d 749, 826 (5th Cir. 1971)).

The facts supporting Williams' abandonment of his car, and the phone it contained, are, if anything, even more indicative of abandonment than the facts making Falsey's abandonment "transparent."   Minton testified that, after crashing the car he was driving into a fence, Williams fled on foot.   Woodruff testified that he found the car with its engine running (obviously, with the keys still in it) and its doors unlocked and open.   Once the car was impounded, and a warrant procured, the phone was discovered.   Unlike the safe in the trunk of Falsey's car, the phone's contents were completely unsecured.[7]   Based on those uncontroverted facts, Williams clearly abandoned any possessory interest he may have had in the phone and its contents.   He, thus, lacks (assuming he ever had) the minimum interest necessary to make a Fourth Amendment challenge of law enforcement's search of the phone's contents.   "[I]f the person from whom the item was seized lacks a cognizable possessory interest in the item [*i.e.*, because he has voluntarily abandoned it], that person's Fourth Amendment rights are not violated by even a lengthy period between seizure and the procurement of a warrant.   That is so because any delay—

---

[7]   Agent Kevin Jarriel testified that the phone discovered in the car was turned off when it was discovered, but once it was turned on, its contents were not secured (*i.e.*, the phone did not require a password to access its contents).

no matter the length—cannot interfere with possessory rights that do not exist." *Sparks*, 806 F.3d at 1340.

Finally, even assuming that Williams had retained a sufficient possessory interest in the phone—despite his incarceration and his abandonment—he has not marshalled sufficient evidence that the balance of the factors tips in his favor. The factors relevant to determining an unreasonable delay include, unexhaustively: (1) "the significance of the interference with the person's possessory interest," (2) "the duration of the delay," (3) "whether or not the person consented to the seizure," (4) "the government's legitimate interest in holding the property as evidence," and (5) whether the police diligently pursued their investigation, including the nature and complexity of the investigation, whether law enforcement personnel had to be diverted to another case, and the quality of the warrant application and the time necessary to prepare it. *Laist*, 702 F.3d at 613-14.

To be sure, Williams is correct to point out that cell phones, like computers, may involve a heightened possessory interest. Doc. 257 at 6-7. However, as discussed at length above, there are factual circumstances that call the existence of his possessory interest into question. Were it

13

necessary, the Court might be inclined to give him the benefit of the duration factor; although the Government is correct that delays of similar length have been accepted as reasonable, far shorter delays have also been regarded as unreasonable. *Compare* doc. 257 at 7 (collecting cases), *with* doc. 278 at 15 (same). Williams, however, offers *nothing* on the application of the other factors. He simply asserts, without any explanation or support, that "[t]he agent's conduct in this case simply cannot be held to be diligent . . . ." His implication appears to be that the very length of the delay, alone, should be dispositive, but none of the cases he cites support that conclusion. *See United States v. Uu*, 293 F. Supp. 3d 1209, 1213 (D. Haw. 2017) ("There is no bright line past which a delay becomes unreasonable."); *United States v. Escobar*, 2016 WL 3676176 at * 4 (D. Minn. July 7, 2016) ("there is no 'bright line past which a delay becomes unreasonable.'" (quoting *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012)).

Williams' argument that the phone and its contents[8] should be suppressed, then, boils down to the claims that (1) cell phones are

---

[8] It bears mentioning that the analysis below appears to apply equally to the phone discovered on Williams' person. Thus, even if he had an adequate Fourth Amendment interest to challenge the search of that phone based on officers' delay, he would not prevail on the factor analysis.

14

particularly personal possessions and (2) law enforcement did not seek a warrant to search the devices for several months after their seizure. That's simply not enough.  *See, e.g., United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." (citation omitted)).   Accordingly, Williams' motion to suppress any evidence found during officers' search of the phone found in the car should be **DENIED**.  Doc. 257.

## III.   ELECTRONIC SEARCHES (CSLI)

As the Supreme Court has recently explained:

There are 396 million cell phone service accounts in the United States — for a Nation of 326 million people.  Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites."   Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings.  Cell sites typically have several directional antennas that divide the covered area into sectors.

Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped

record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter v. United States*, ___ U.S. ___, 138 S. Ct. 2206, 2211-12 (2018).

Williams' motion requires the Court to determine whether CSLI, the collection of which was authorized by a state court, must be suppressed.

### A. Standing

Williams expressly asserts his "standing . . . as an individual at whom wiretap interception was directed, and as an individual whose communications, and whose location information, was unlawfully intercepted." Doc. 260 at 9. Despite his express assertion of his standing,

he has not provided much evidentiary support. *See id.* Further, the Court is not convinced that the legal analysis underlying his assertion is sound. He cites, first, to *United States v. Terry*, 572 F.3d 430, 432 (7th Cir. 2009), which recognizes a statutory, not constitutional, basis for suppression under Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. § 2510, *et seq.* The *Terry* court expressly noted that defendant's "standing to challenge the wiretap evidence . . . is not disputed." 572 F.3d at 432 n. 2. That's not the case here. *See* doc. 279 at 5 (challenging Williams' "standing"). *United States v. Marcello*, 508 F. Supp. 586, 602 n. 2 (E.D. La. 1981), also involved statutory "standing." *See id.* (noting that several defendants' "standing" was uncontested, but finding that all defendants were "aggrieved persons," within the meaning of 18 U.S.C. § 2518(10)(a)). Williams' citation to *Carpenter*, in general, is indicative of a theory of standing, but hardly explicit.

The Government, for its part, contends that "[e]ven post-*Carpenter*, a defendant still bears the burden of establishing a privacy interest in the phone or its data." Doc. 279 at 6 (citing *United States v. Oakes*, 320 F. Supp. 3d 956, 961 (M.D. Tenn. 2018) ("*Carpenter* has not changed that, before Defendant can assert a Fourth Amendment violation, he has to be

17

able to assert a personal connection to the place or object in which he claims a privacy right")).  *Oakes* is instructive in its careful consideration of *Carpenter*'s implications.  There, the defendant argued that *Carpenter*, and other recent Supreme Court opinions, "abrogated the Fourth Amendment 'standing' concept of needing to have a possessory interest in an item or place that has been searched; [and that] *Carpenter* created a broad privacy interest in the whole of an individual's physical movements," and thus defendant had "standing" to challenge the collection of CSLI from a phone he "did not own, use, control, exclude others from using, knowingly possess, or have any awareness might be tracking him."  *Oakes*, 320 F. Supp. 3d at 961.  The court, in *Oakes*, rejected that "ambitious reading" because it "cut[ ] far too wide a swath across Fourth Amendment jurisprudence."  *Id*.

Williams advances a similarly, if not equally, "ambitious" reading of *Carpenter* when he asserts that it held that an individual has an expectation of privacy in his physical movements.  Doc. 260 at 10 (quoting *Carpenter*, 138 S. Ct. at 2217).  The evidence, however, places the case at bar somewhere between the facts of *Carpenter* and *Oakes*.  In *Carpenter*, as the *Oakes* court points out, the Court "only considered the issue of

someone alleging a violation of the privacy *of their own phone*."  *Oakes*, 320 F. Supp. 3d at 960 (emphasis added).  However, Williams' interest in the cellular account at issue is ambiguous.  *See generally* doc. 260; *see also* doc. 279 at 1 (asserting that Williams "fails to specify which number belongs to him," but "[o]f the fifteen numbers, none are subscribed to him, and all are alleged in the search warrant affidavits to belong to other co-defendants or unknown persons.").  *Oakes'* conclusion that *Carpenter* does not displace the entirety of Fourth Amendment "standing" jurisprudence and create a privacy interest "in the whole of an individual's physical movements" is compelling.  It does not, however, resolve the specific question of whether an individual, who is not the formal account subscriber/owner of a cell phone on or about his person, whose movements are captured through CSLI, has standing to seek suppression of that location data.

Williams also argues that he has an independent statutory right of suppression, afforded by 18 U.S.C. § 2518(10)(a).  The statute permits "[a]ny aggrieved person" to seek suppression of "the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that," the interception was unlawful,

the order authorizing the interception is facially insufficient, or the interception did not conform to the authorization.  *Id.*  "Aggrieved person," is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  On its face, therefore, the statute provides an especially broad suppression right.  Courts, however, have consistently recognized that the statutory provision incorporates existing Fourth Amendment "standing" limitations.  *See Alderman v. United States*, 394 U.S. 165, 175 (1969); *see also, e.g., United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) ("aggrieved person should "be construed in accordance with standing requirements usually applied to suppression claims under the Fourth Amendment.") (quotes and cite omitted).

Although the Court is not entirely convinced by Williams' arguments, he has asserted a (barely) sufficient interest in at least one of the cell phone accounts subject to the state court authorizations.  In his reply brief, he contends that he "owned and possessed" the account associated with the number (678) 333-XXXX (the phone removed from the vehicle).  Doc. 301 at 4; *see also* doc. 301-1 at 3, ¶ 3.  That number was

subject to an authorization issued by the state court on February 7, 2018. *See* doc. 279, Ex. I.  The affidavit supporting the application for that authorization indicates that it was not subscribed to Williams.[9]  *See* Gov't Ex. U at 71 (alleging that the number (678) 333-XXXX was subscribed to an individual "J[.] A[.]" at an address in Lithonia, Georgia, and that the affiant's search for that address in "law enforcement and open source databases reveal[ed] that it "doesn't exist" and found "no evidence of a [J.A.] in Lithonia[,] Georgia").  Williams' assertion that he "owned and possessed" the account doesn't necessarily contradict the affidavit's assertion and might support a subjective expectation of privacy in that account.  That expectation alone, however, does not bring this case into the ambit of *Carpenter* and *Oakes*.

Nevertheless, it is clear that Williams was a target of the investigation by law enforcement no later than January 2018.  *See* doc. 301 at 6; *see also* doc. 260 (citing Ex. 260-C. at 20 (listing Williams as a "person[] . . . likely to be intercepted"); doc. 301 at 7 (citing Ex. F at 6 (affidavit in support of PRTT of (404) 883-XXXX, referring, albeit

---

[9]  The authorizations and the affidavits supporting them are filed under seal.  The Court will, therefore, avoid quotation of those documents and minimize any specific information (*i.e.*, names and specific phone numbers) discussed.  Some discussion of their substance, however, is unavoidable.

tangentially, to Williams' relationship with named conspirators), Ex. I at 5 (affidavit stating that Williams was "documented" as traveling to Houston "for criminal purposes"), Ex. J. at 8 (affidavit stating that "C29" is "controlled by . . . Williams"). The Court will assume, without deciding, that Williams had a sufficient Fourth Amendment interest to support his challenge of the collection of the CSLI.

## B. Collection of CSLI

Williams has identified and produced several authorizations for the collection of CSLI, whether historical or prospective, that he contends are inadequate. *See* doc. 260 at 1 n. 1 (explaining that "[i]n order to avoid inundating the Court and the government with all of the filings and orders relating to the numerous pen register/trap and trace devise and wiretap applications, Mr. Williams has cited to, and submitted under seal as exhibits, only the filings and orders most relevant to his Motion."). The Government has submitted a much broader, although apparently still limited, selection.† Although numerous, the authorizations can be considered in two groups, based on their statutory sources: (1) those that rely on the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.* (the

"SCA authorizations"); and (2) those that rely on Title III, 18 U.S.C. §§ 2510, *et seq.* (the "Wiretaps").

Even given the benefit of the doubt on his standing, there are several clear obstacles to the relief Williams seeks.  He relies too heavily on *Carpenter*.  *See* doc. 260 at 12 ("A conclusion that the evidence obtained as a result of the PRTT Applications and Order, and the Wiretap Affidavits and Orders should be suppressed is supported by *Carpenter*.").  The Government, however, disputes *Carpenter*'s application, given the chronology.  *See* doc. 279 at 14 (arguing that, at the relevant times (*i.e.*, *prior* to the issuance of the opinion in *Carpenter*), "the existing legal authority in the Eleventh Circuit was settled that the government did not need to obtain a warrant to obtain historical cell-site records in criminal investigations.").  Moreover, the applications expressly seek, and the SCA Authorizations expressly grant, "[w]arrant[s]."  *See* doc. 279, Ex. A at 1 (seeking "Search Warrant for Stored Electronic Data"); Ex. B. (making specific "finding[ ] of fact" that there was "*probable cause* to believe that the records or other information sought are relevant and material to an ongoing investigation and that the information likely to be obtained by such . . . disclosures will be material evidence" in a criminal prosecution

(emphasis added)).  Even assuming *Carpenter* applies, then, it is not clear that officers failed to follow its command to "get a warrant."  *Carpenter*, 138 S. Ct. at 2221.  Insofar as the Court now concludes that the authorizations (though perhaps facially irregular) qualify as warrants, the warrant requirement has been substantially satisfied, and the question of whether *Carpenter* should be applied retroactively is moot.

Williams raises several objections to the form of the SCA Authorizations, which appear to implicitly raise an overbreadth challenge. *See* doc. 260 at 11-12.  To be sure, the Fourth Amendment requires searches to be "as limited as possible."  *See United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017).  Williams argues that "[t]he PRTT Orders did not provide that the cell-site location information was evidence to be searched for and seized," doc. 270 at 11-12, but the Orders direct the service provider to "provide historical . . . cell site location data records for the . . . subject telephone number for the immediate thirty (30) days preceding the date of this Order."  *See, e.g.,* Ex. B at 3.  That isn't obviously overbroad.  If there is an argument that it is, Williams hasn't spelled it out.

Williams' argument that the authorizations "fail to satisfy either State or federal requirements for valid search warrants," doc. 301 at 18, is not completely explicit.  He points out that the authorizations are not prototypical search warrants, but other than citing to procedural rules, he points to no constitutional defects that would preclude construing the authorizations as warrants.   At least some of Fed. R. Crim. P. 41's requirements are merely ministerial.  *See United States v. Diecidue*, 603 F.2d 535, 562 (5th Cir. 1979) ("This Court has held that defects in the return of a warrant are ministerial in nature and do not invalidate a search."); *see also United States v. Hamilton*, 2017 WL 9476881 at * 3 (N.D. Ga. Jan. 3, 2017) ("The failure to comply with the return and inventory requirement [of Rule 41] . . . is a ministerial defect that does not affect the validity of the search." (quotes and cite omitted).  Federal law, therefore, is "'clear after *United States v. Leon*, [cit.], that technical defects in a warrant do not call for or permit exclusion of what the search produces. . . .  In light of *Leon*, it is difficult to anticipate *any* violation of Rule 41, *short of a defect that also offends the Warrant Clause of the [F]ourth [A]mendment*, that would call for suppression.'" *United States v.*

*Trost*, 152 F.3d 715, 722 (7th Cir. 1998) (quoting *United States v. Hornick*, 815 F.2d 1156, 1158 (7th Cir. 1987) (Easterbrook, J.)) (emphasis added).

Williams' citations to Georgia law concerning the formal requirements for warrants, *see* doc. 260 at 11-12 (citing O.C.G.A. §§ 17-5-21(a), 17-5-25, and *Bryant v. State*, 301 Ga. 617 (2017)), are inapposite. *See United States v. Gordon*, 2015 WL 7863289 at * 3 (N.D. Ga. Dec. 2, 2015) ("Courts in our circuit consistently have held that a violation of state law in procuring a warrant is immaterial to whether a federal court must suppress the evidence," and collecting cases). Georgia law, even assuming it applies, takes a similarly skeptical view regarding a warrant's "technical" defects. *See* O.C.G.A. § 17-5-31 ("No search warrant shall be quashed or evidence suppressed because of a technical irregularity not affecting the substantial rights of the accused.").

The question, then, is whether the authorizations at issue satisfy the Fourth Amendment. *See* U.S. Const. Amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); *see also, e.g., Johnson v. United States*, 333 U.S. 10, 14 (1948) (Fourth Amendment's "protection consists in requiring that [the]

inferences [which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

The SCA authorizations purport to be based on probable cause. *See, e.g.,* Ex. C at 2. Further, the affidavits supporting the applications assert that the information provided "show[s] probable cause to obtain" CSLI and other tracking data.[10] In considering whether the affiant's proffer and state court judge's acceptance of the existence of "probable cause" for the authorizations are adequate, it is important to remember that the standard for review is "exceedingly deferential." *See United States v. Rangel*, 2018 WL 817845 at * 6 (S.D. Ga. Jan. 18, 2018). "A reviewing court's task is not to make a *de novo* finding of probable cause but rather

---

[10] In this summary, the Court relies both on the affidavits admitted as evidence as well as those attached to Williams' brief. Although not admitted, those affidavits reflect the same proffer of "probable cause." *Compare* Ex. 260-A at 1 (stating that the affidavit is submitted "to obtain . . . a search warrant for location data, telephone records ('tolls') related to the target telephone number, billing information, and subscriber information" and that the affiant "believes the following facts support probable cause" for obtaining that information), *with* Ex. U at 1 (same); *see also* Ex. 260-C at 2 (stating that the affiant has included "only the salient facts necessary to establish probable cause"), Ex. 260-D at 2 (same), Ex. 260-E at 2 (same), Ex 260-G at 3 (same), Ex. 260-H at 3 (same).

The Court refers to exhibits attached to Williams' brief (doc. 260) as "Ex. 260-__". The Government's exhibits, which were admitted into evidence at the hearing, will be referred to simply by their exhibit designation.

to decide whether the issuing magistrate—whose assessment of the affidavit's factual presentation is entitled to 'great deference'—had a 'substantial basis' for finding probable cause." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983)).  In even "'doubtful or marginal cases,'" the probable cause determination should be upheld. *Id.* (quoting *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977)).  Probable cause, itself, requires neither convincing proof nor *prima facie* showing of criminality; only a "substantial chance" of such activity is required. *See Gates*, 462 U.S. at 235.  While reasonable minds might differ on whether the affidavits supporting the authorizations established probable cause, the state court judge certainly had a substantial basis for finding that they did.

To the extent that Williams argues that the SCA Authorizations cannot be warrants because they "failed to adequately describe the places to be searched, and the persons or things to be seized," his argument fails. Doc. 301 at 9.  Unlike the merely formal requirements imposed by the Federal Rules or state law, the requirement that the warrant describe, with sufficient particularity, the place to be searched and the items to be sized is constitutional.  If the authorizations were impermissible "general

28

warrants," then their foundation upon a neutral magistrate's finding of probable cause would not save them.  *See, e.g., Groh v. Ramirez*, 540 U.S. 551, 557 (2004) ("The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents."). However, the authorizations at issue do describe the "place" to be searched and the "items" to be seized, to the extent that "the circumstances and nature of the activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982).  That is as much particularity as the Fourth Amendment requires.  *See id.*

Given the ephemeral nature of cell-phone service and data, and CSLI in particular, it is not immediately obvious what the exact contours of the Fourth Amendment's particularization requirement are.  It seems clear that a cell-service provider might access the relevant data from any number of locations.  Thus the authorizations' descriptions of particular information from a particular service provider and a particular account or number associated with that provider seem calculated to avoid "general, exploratory rummaging," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), either through the data maintained by the service provider generally or even through the particular subscriber's data.    The

authorization's limitations to particular subscribers and further to particular subsets of each given subscriber's data (*i.e.* limits imposed upon the prospective and retrospective temporal scope of the data) seem adequate to satisfy the constitutional requirement.[11]

The above analysis notwithstanding, the Wiretaps do not include an express[12] finding of probable cause. *See* Ex. Q; Ex. R; Ex. S; Ex. T. They do, however, require the respective service providers to disclose, among other information, "cell cite [sic] data, [and] GPS Location Data [sic] . . . ." Ex. Q at 2; Ex. R at 2 (same); *id.* at 8 (same); Ex. S at 2 (same); Ex. T at 2

---

[11] Until *Carpenter*, it was generally assumed that the statutory requirements of either the Stored Communications Act or Title III governed the acquisition of such information. *See, e.g.,* Wayne R. LaFave, Jerold H. Israel, *et al*., 2 Crim. Proc. § 4.5 (4th ed. 2018) (explaining the coverage of the Stored Communications Act, Title III, and the Pen Register Statute, respectively). The parties have not pointed to any authority, and the Court is not aware of any, establishing the particularity required to authorize the collection of CSLI.

Although the SCA Authorizations contemplate the installation of pen registers, it seems impossible that Williams' challenge relates to those portions. He seeks suppression of evidence but violations of the pen register statute do not support suppression. *See, e.g., United States v. Thompson*, 936 F.2d 1249, 1251-52 (11th Cir. 1991) (explaining that the only statutory remedy for pen register violations are "fines and possible imprisonment," and thus suppression was properly denied). Accordingly, the Court has construed his challenge as limited to the authorization of the collection of "stored electronic data," including historical CSLI.

[12] There is, perhaps, an implicit probable cause finding. The Orders reflect that, in each case, "an investigative warrant has been issued," and that document is "expressly incorporated by reference." *See, e.g.,* Ex. Q at 1. No such "warrants" have been produced, however.

(same).[13]   Given the statutory requirements, however, the facial discrepancy is a distinction without a difference.  Title III is explicit that "probable cause" is required for issuing a wiretap order.  *See* 18 U.S.C. § 2518(3)(a)-(b), (d).  There is, thus, no distinction between a Court's authorizing a wiretap, pursuant to § 2518, and issuing a search warrant.  *See, e.g., United States v. Nixon*, 918 F.38 895, 900 (11th Cir. 1990) ("An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant.").  *Carpenter*, meanwhile, was concerned with the disclosure of CSLI based upon the less-demanding "reasonable grounds" standard imposed by the Stored Communications Act.  *See Carpenter*, 138 S. Ct. at 2212 (quoting 18 U.S.C. § 2703(d)) (stating that the prosecutors acquired CSLI through "court orders under the Stored Communications Act," which requires only a showing of "'reasonable grounds to believe'" the records are relevant and material to

---

[13] A further facial distinction between the two groups of authorizations is the statutory authority they cite.  Those authorizations which explicitly find that probable cause exists rely on the Stored Communications Act.  *See, e.g.,* Ex. B. at 1 (citing, *inter alia*, 18 U.S.C. § 2703(c) and (d)).  The second group, discussed below, explicitly rely on "Chapter 119 of Title 18 of the United States Code Annotated," *i.e.* 18 U.S.C. §§ 2510, *et seq.*  As explained below, the difference between the two statutory schemes seems fundamental to the application, or not, of *Carpenter*.

a criminal investigation). *Carpenter,* in other words, does not affect data collected pursuant to Title III.[14]

The authorizations issued pursuant to the Stored Communications Act, then, expressly exceed the "reasonable grounds" the statute requires and satisfy all of the substantive requirements for a warrant imposed by the Fourth Amendment. Any technical defect in the form of the warrants is insufficient to require suppression. Further, the authorizations issued pursuant to Title III must have been based upon a finding of probable cause, again substantively adequate for Fourth Amendment purposes. The effect of the above analysis demonstrates that all of the authorizations remain valid, even after *Carpenter*.

Even assuming that there is some substantive—as opposed to merely formal or technical—defect in the authorization's satisfaction of the warrant requirement, the Court must consider the application of *Leon*'s

---

[14]   The Court makes no finding on the authorizations' satisfaction of the other requirements of Title III. Such orders are "presumed to be valid, and a defendant has the burden of overcoming this presumption and proving that the wiretap order was unlawfully obtained." *United States v. Montemayor*, 2018 WL 4517634 at * 5 (N.D. Ga. Aug. 27, 2018) (citing, *inter alia*, *United States v. Mitchel, III*, 274 F.3d 1307, 1310 (10th Cir. 2001)). Williams has not asserted, much less shown, that the authorizations are insufficient under Title III.

good-faith exception to the exclusionary rule.[15]   In considering the application of *Leon*, it is important to note that Williams does not challenge the facial sufficiency of the authorizations' determination that the supporting affidavits provide probable cause, contend that the affidavits contained knowing or reckless falsehoods, or allege that the state judge signing the authorizations was anything other than neutral and detached.  *See generally* docs 260 & 301; *see also Leon*, 468 at 914-15.  In the absence of any such Fourth Amendment-offending defects, the Supreme Court has found that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."   *Id.* at 919.   *Leon* emphasized that "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  *In the ordinary case, an officer*

---

[15]  On February 20, 2019, defendant submitted supplemental briefing on the question of whether *Carpenter* applies retroactively.  *See* doc. 346.  It does not, however, add any argument on the question of whether the *Leon*'s good-faith exception applies.  *See id.* at 2 (relying upon "all of the reasons and authorities presented in his initial pleading, reply brief, and at [the] oral hearing" in support of his contention that the exception should not apply).  For the reasons explained above, the Court is not convinced that *Carpenter* applies as Williams contends.  Regardless, for the reasons explained below, *Leon* applies to preclude suppression here.

*cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.*" *Id.* at 921 (emphasis added).  This is such a case.

Following the Supreme Court's decision in *Carpenter*, several courts have been faced with the same situation faced here: whether the good faith exception applies in cases where law enforcement acquired CSLI, in compliance with the SCA, but without a warrant.  Those Courts have all found that pre-*Carpenter* compliance with the SCA established good faith. *See United States v. Joyner,* 899 F.3d 1199, 1204-05 (11th Cir. 2018); *see also United States v. Goldstein*, 914 F.3d 200, 204-05 (3d Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *United States v. Curtis*, 901 F.3d 846, 847-49 (7th Cir. 2018); *United States v. Chambers*, ___ F. App'x ___, 2018 WL 4523607 at * 2-3 (2d Cir. Sept. 21, 2018); *see also, e.g., United States v. Gibbs*, 2018 WL 6331341 at * 6-7 (N.D. Ga. Dec. 4, 2018); *United States v. Scott*, 2018 WL 5087237 at * 2 (S.D. Ga. Oct. 28, 2018). Several confronted the argument that the Court's GPS-tracking jurisprudence precluded application of the exception in these circumstances.  None accepted it.

Finally, assuming as the Government does, that the principal focus of Williams' motion is the collection of real-time, as opposed to historical, cell site location information, *see* doc. 279 at 20-22, his motion also fails.[16] As the Government points out, at most, collection of real-time CSLI requires a warrant. *See id.* at 21. Since, as discussed above, it appears that the state judge permitted collection of CSLI, based on a necessary (if sometimes implicit) finding of probable cause, those authorizations are tantamount to warrants. *See* doc. 279, Ex. J at 2. Thus, the analysis above, including the potential application of *Leon*'s good-faith exception, appears to apply equally to the collection of real-time CSLI.

Since the Court finds that there was no Fourth Amendment violation in the state court's authorization of the collection of CSLI or, alternatively, that officers' good-faith reliance on the authorizations nullifies the violation, there is no need to consider whether subsequent evidence was

---

[16] The Government contends that "Williams spends the majority of his motion challenging law enforcement's collection of real-time CSLI." Doc. 279 at 20. The Court is not entirely convinced by that assessment. To be sure, Williams' motion *mentions* the collection of real-time CSLI. *See* doc. 260 at 7 (alleging that law enforcement "monitored GPS using a number belonging to Mr. Williams" to track his location). To the extent that Williams' motion relies heavily on *Carpenter*, that suggests that historical CSLI is his target. *See* doc. 279 at 20-21 (noting *Carpenter*'s express withholding of any opinion on real-time CSLI). His reply emphasizes his challenge to both prospective and retrospective CSLI. *See* doc. 301 at 14-16.

"fruit of the poisonous tree."  Accordingly, Williams suppression motions (docs. 257 & 260) should be **DENIED**.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 27th day of

February, 2019.

Christopher L. Ray
United States Magistrate Judge
Southern District of Georgia

---

† Several of the affidavits attached to Williams' motion are not included among the Government's exhibits, which were the only exhibits admitted into evidence. *See* doc. 332 at 3 (minute entry listing evidence admitted). Despite the fact that Williams' exhibits were not admitted, the Court will refer to them to the extent they are consistent with the admitted exhibits. For reference, Williams' proffered exhibits correspond to the Government's admitted exhibits as follows:

| Williams Exhibit (attached to doc. 260) | Gov't Ex. |
|---|---|
| Ex. A (Affidavit in support of PRTT for (912) 323-XXXX) | Ex. U at 1-12 |
| Ex. B. (PRTT authorization for (912) 323-XXXX) | Ex. B |
| Ex. C (Sealed affidavit in support of a "warrant authorizing the interception of wire communications to and from cellular number (912) 755-[XXXX] (Sprint Wireless) or any subsequently assigned telephone number") | Not Included, *but see* Ex. C ("Sealed Order authorizing the installation of a pen register and trap and trace device and search warrant for stored electronic data" for "Sprint Wireless number (912) 755-[XXXX]"). |
| Ex. D (Sealed affidavit in support of "a warrant and order authorizing the interception of wire & text communications to and from cellular numbers [sic] C3 (470) 368-[XXXX] (Verizon Wireless) & cellular number C10 (912) 401-[XXXX] (AT&T Wireless) or any subsequently assigned telephone number") | Not Included, *but see* Ex. E ("Sealed order authorizing the installation of a pen register and trap and trace device and search warrant for stored electronic data" for "Verizon Wireless number (470) 368-[XXXX]"), Ex. F (same for "AT&T Wireless number (912) 401-[3631]"). |
| Ex. E (sealed affidavit in support of "a warrant and order authorizing the interception of wire & text communications to and from Cellular C23 (912) 401-[XXXX] (AT&T Wireless) | Not Included, *but see* Ex. G ("Sealed Order authorizing the installation of a pen register and trap and trace device and search warrant for stored electronic data" for "AT&T Wireless number (912) 401-[XXXX]") |

37

| | |
|---|---|
| or any subsequently assigned telephone number") | |
| Ex. F at 1-10 (Sealed Affidavit in support of "an order authorizing the installation and use of a pen register device, search warrant for stored electronic data, enhanced caller ID special calling feature, a trap and trace device, cell site location data, global positioning satellite or precision location and disclosure of telephone subscriber records for cellular number C29 (404) 883-[XXXX] T-Mobile Wireless) | Ex. U at 75-84 |
| *Id.* at 11-16 ("Sealed application for pen register and trap and trace device and search warrant for stored electronic data" for C29) | Not included |
| *Id.* at 17-21 ("Sealed Order authorizing the installation of a pen register and trap and trace device and search warrant for stored electronic data" for C29) | Ex. J |
| Ex. G at 1-66 (Sealed affidavit in support of "an investigation warrant and order authorizing the interception of wire & text communications to and from cellular C31 (912) 412-[XXXX] (AT&T Wireless) or any subsequently assigned telephone number") | Not Included, *but see* Ex. T (Sealed Court Order pursuant to O.C.G.A. § 16-11-64 and Chapter 119 of Title 18 of the United States Code Annotated for AT&T Wireless number (912) 412-[XXXX]). |
| *Id.* at 67-69 (Fax of Electronic Surveillance Worksheet to Verizon LE Division) | Not Included |
| Ex. H at 1-66 (Sealed affidavit in support of "an investigation warrant and order authorizing the extention [sic] of interception of wire & text communications to and from cellular C3 (470) 368-[XXXX] (Verizon Wireless) or any subsequently assigned telephone number) | Not Included, *but see* Ex. R ("Sealed Court Order pursuant to to O.C.G.A. § 16-11-64 and Chapter 119 of Title 18 of the United States Code Annotated" for Verizon Wireless number (470) 368-[XXXX]). |

| | |
|---|---|
| Ex. I. (Sealed affidavit in support of "an order authorizing the installation and use of a pen register device, search warrant for stored electronic data, enhanced caller ID special calling feature, a trap and trace device, cell site location data, global positioning satellite or precision location and disclosure of telephone subscriber records for the cellular number C30 (912) 704-[XXXX] Verizon Wireless) | Ex. U at 85-94 |
| Ex. J (Sealed affidavit in support of "an order authorizing the installation and use of a pen register device, search warrant for stored electronic data, enhanced caller ID special calling feature, a trap and trace device, cell site location data, global positioning satellite or precision location and disclosure of telephone subscriber records for cellular number C35 (912) 412-[XXXX] AT&T Wireless). | Ex. U at 107-119 |