1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF GEORGIA
2                SAVANNAH DIVISION

3


4   UNITED STATES OF AMERICA,    :
                                 :
5     v.                         :
                                 :   CASE NUMBER CR-4:18-00147
6   HERMAN WILLIAMS              :
    and VINCENT HOOPER,          :
7                                :
        Defendants.              :
8   _____

9

10

11

12       PARTIAL TRANSCRIPT OF MOTION/EVIDENTIARY HEARING
                (Pertaining to Herman Williams)
13
         Before the Honorable Christopher L. Ray
14            United States Magistrate Judge

15            United States Courthouse
                 125 Bull Street
16             Savannah, Georgia
                January 24, 2019
17

18

19

20

21

22

23  TRANSCRIBED BY:  Victoria L. Root, CCR
                     United States Court Reporter
24                   Post Office Box 10552
                     Savannah, Georgia  31412
25                   (912) 650-4066

Proceedings recorded by FTR.  Transcript subsequently produced
  by mechanical stenography and computer-aided transcription.

2

1                    A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:

4            CHRISTOPHER HOWARD, Esquire
             Assistant United States Attorney
5            Post Office Box 8970
             Savannah, Georgia  31412
6            (912) 652-4422

7

8    FOR DEFENDANT WILLIAMS:

9            THOMAS A. WITHERS, Esquire
             Gillen, Withers & Lake, LLC
10           8 East Liberty Street
             Savannah, Georgia  31401
11           (912) 447-8400

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

                                                            Page

PROCEEDINGS. . . . . . . . . . . . . . . . . . . .        5

DEFENDANT WILLIAMS' BRADY MOTION . . . . . . . . . .      6

DEFENDANT WILLIAMS' MOTION TO SUPPRESS . . . . . . .      6


WITNESSES FOR THE GOVERNMENT

        1. BRENT MINTON
           Direct Examination by Mr. Howard. . . . .     12
           Cross-Examination by Mr. Withers. . . . .     23
           Redirect Examination by Mr. Howard. . . .     26
           Recross-Examination by Mr. Withers. . . .     28

        2. GARY WOODRUFF
           Direct Examination by Mr. Howard. . . . .     35

        3. BARRY RIPLEY
           Direct Examination by Mr. Howard. . . . .     38
           Cross-Examination by Mr. Withers. . . . .     61
           Redirect Examination by Mr. Howard. . . .     72

        4. KEVIN JARRIEL
           Direct Examination by Mr. Howard. . . . .     73
           Cross-Examination by Mr. Withers. . . . .     80


CLOSING ARGUMENTS
           By Mr. Withers. . . . . . . . . . . . . .     85
           By Mr. Howard . . . . . . . . . . . . . .     88
           By Mr. Withers. . . . . . . . . . . . . .     93


CERTIFICATE OF REPORTER. . . . . . . . . . . . . .       95

4

1                        E X H I B I T S

2

3    EXHIBIT NUMBER          IDENTIFIED      TENDERED      ADMITTED

4    Government's A             39             39            39
     Government's D             16             17            17
5    Government's E             76             77            77
     Government's F             77             77            77
6    Government's U             75             76            76
     Government's Z             27             27            27

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                     -oOo-

3       (Call to order at 9:07 a.m.)

4           COURT CLERK:  The Court calls the case of *United*

5  *States of America v. Vincent* -- I mean, *Herman Williams and*

6  *Vincent Hooper*, Criminal Case Number CR-4:18-00147.

7           MR. HOWARD:  The Government is ready to proceed,

8  Your Honor.

9           MR. WITHERS:  Tom Withers on behalf of

10  Herman Williams, and we are ready, Your Honor.

11          THE COURT:  All right.  Good morning.

12          MR. WITHERS:  Good morning.

13          THE COURT:  So as it pertains to Mr. Williams this

14  morning, I'm informed that there are three outstanding motions

15  from the Defense: the *Brady* motion at Docket 255, a motion to

16  suppress the phones at Docket 257, and a motion to suppress the

17  wiretap PRTT at 260.

18          Do you intend to argue the *Brady* motion today,

19  Mr. Withers?

20          MR. WITHERS:  Just very briefly, Your Honor.

21          THE COURT:  Why don't we start there, then.

22          MR. WITHERS:  Okay.  Do you want me to come to the

23  podium?

24          THE COURT:  Please.

25          MR. WITHERS:  Your Honor, just with respect to the

1    *Brady* motion, it's more procedural than anything.  So what has

2    happened sometimes in the past is the magistrate judges have

3    entered orders that say the *Brady* motion is moot.  And my only

4    request would be that either the *Brady* motion continues to be

5    ripe or that it's granted because I don't think, you know,

6    *Brady* requests ever become moot.

7          So that's -- my only request there is that an order

8    not be entered, you know, if I don't address it in a pretrial

9    hearing fashion, not be entertained that it's moot or denied

10   or what have you, just that it continues to be ripe.  And the

11   Government, I'm certain, is aware of their continuing

12   obligations in that respect.

13         THE COURT:  All right.  Thank you, Mr. Withers.

14         The Government's response?

15         MR. HOWARD:  Your Honor, the Government is not

16   opposed and certainly understands its *Brady* obligations and

17   will continue to disclose *Brady* oblig- -- or *Brady* materials,

18   you know, should they become available.  So I am not opposed

19   to the Court saying that, you know, their -- the -- it

20   continues to be ripe, I think as defense counsel phrased it.

21         THE COURT:  All right.  Anything else on the *Brady*

22   motion, gentlemen?

23         MR. WITHERS:  No, Your Honor.

24         THE COURT:  All right.  Thank you.

25         Mr. Withers, let's move on, then, to your motion to

1    suppress the phones, Docket Number 257, please.

2              MR. WITHERS:  Thank you, Your Honor.

3              Your Honor, with respect to the motion to suppress

4    the cell phone searches, in the motion, we have moved to

5    suppress Device Number 1.  The affidavit in question says that

6    Device Number 1 was seized incident to arrest at Paragraph 17.

7    And we'd move to suppress Device Number 14, which the affidavit

8    speaks to that as having been seized from the Toyota Corolla.

9    That's at Paragraph 22 of the affidavit.

10             In response, the Government says that Device

11   Number 1, which ends in 4990, was found abandoned in the car

12   and that Device Number 14, which ends in 6677, was seized from

13   Mr. Williams' personally.

14             We filed a joint declaration to address the standing

15   issue in response to the Government's concerns there, and it is

16   attached to the wiretap reply brief.  We do -- in that

17   declaration, we do not establish standing as to 6677, so I

18   think the Court can conclude that there is no standing with

19   respect to 6677.  And, again, based upon the Government's

20   representation, that would be Device 14.  I think although --

21             THE COURT:  I want to ask a question about that.

22   I'll ask both counsel to clarify this when you have an

23   opportunity.

24             Having read the briefs, I think there may be some

25   confusion or transposition as to what is Device 14 and what is

8

1   Device 1, so I want -- before we leave today, I want to make

2   sure we're clear on which device is which.  Let me just ask

3   this question.

4          And I'll allow the Government, if you don't mind,

5   Mr. Withers, just to speak at this point.

6          MR. WITHERS:  Okay.

7          THE COURT:  With regard to the Verizon 4G LTE cell

8   phone, which device is that, and where was it found, and what

9   phone number is associated with it?

10         MR. HOWARD:  Your Honor, I'm happy to address that.

11  So it's -- we're talking about Device Number 1 -- what's listed

12  as Device Number 1 in the affidavit, and that is the number

13  ending in 4990.  I can give you the full number.  It's

14  (678) 333-4990.  That's the device which defense counsel, in

15  the reply, submitted an affidavit claiming standing for.

16         That -- and the search warrant affidavit, as

17  Your Honor notes, transposed the location of those.  And we

18  addressed that in Footnote 1 in our response.  I have the

19  affiant here.  I intend to put him up on the stand and explain

20  how exactly that happened.  But that was found abandoned --

21  well, it's our position that it was abandoned, but it was found

22  in the Toyota Corolla the day of Mr. Williams' arrest.

23         Device Number 14, which does not have -- which I

24  think has been acknowledged does not have standing, that is

25  the number ending in 6677.  That was found by Agent Minton

9

1  at Williams' arrest.  So Williams gets out of the car, runs,

2  gets arrested.  That's found search incident to arrest.

3            THE COURT:  All right.  Thank you.

4            Mr. Withers, are you in agreement with that?

5            MR. WITHERS:  I -- I think the Government has to put

6  on some evidence with respect to that --

7            THE COURT:  Fair enough.

8            MR. WITHERS:  -- Your Honor.  So my suggestion would

9  be, since there's an error in the affidavit, I think that the

10 Government needs to put on evidence with respect to that.  And

11 then with -- and then with respect to the issue of 4990/1, the

12 evidence -- the Government has to establish the issue of

13 abandonment with respect to that.

14           THE COURT:  Fair enough.  And we'll come to that in

15 the Government's case.  Thank you.  Go ahead, Mr. Withers.

16           MR. WITHERS:  And so that's -- that would conclude my

17 presentation.  The Court's obviously picked up on the confusion

18 with respect to the transposition of the exhibit numbers, I

19 guess, in the affidavit.

20           THE COURT:  All right.  Thank you, Mr. Withers.

21           MR. WITHERS:  Thank you.

22           THE COURT:  The Government, please.

23           MR. HOWARD:  Your Honor, I -- that certainly

24 addresses the standing.  I intend to call the agents and

25 certainly hope we have an opportunity to address the various

1   factors laid forth in *Laced* (phonetic), if I'm pronouncing that

2   Eleventh Circuit case correctly, which deals with significance

3   of the interference with the person's possessory interest,

4   the duration of the (inaudible), whether or not the person

5   consented to the seizure, and then the legitimate interest in

6   holding the property as well as the complexity of the

7   investigation.  So those various factors I do intend to have

8   witnesses draw out.

9         But with Your Honor's permission, just as a matter

10  of housekeeping, I've provided the exhibits in this same

11  lettering and have provided defense counsel with a copy as

12  I put in response to my various filings.  So I don't know if

13  there's any objection, but I would move to admit those to

14  allow the Court to formally consider those exhibits the --

15  in response to Mr. Williams' motion that were filed with the

16  Court, provided to counsel.

17        THE COURT:  Mr. Withers, any objection to admitting

18  those exhibits?

19        MR. WITHERS:  I -- I'm uncomfortable admitting those

20  en masse, Your Honor, without them having been identified in

21  some respect in a hearing.

22        THE COURT:  In that case, we'll have to take them one

23  at a time.

24        MR. HOWARD:  Understood, Your Honor.

25        So I would first call Agent Brent Minton.

1          MR. WITHERS:  Your Honor, I would invoke the rule.

2          THE COURT:  Yeah.  Let's -- let's actually do this.

3   If anyone has witnesses present who are going to testify in

4   this case -- and I look to counsel to be responsible for

5   this -- please identify any witnesses who could appear in this

6   matter and ask them to leave the courtroom.

7          Yeah.  Actually, Ms. Flanders raised a good point.

8   Let's do an oath to all witnesses who will testify so we can

9   take care of that today.

10          COURT CLERK:  Please stand and raise your right hand.

11      (All prospective witnesses were sworn by the clerk.)

12          COURT CLERK:  Thank you.

13          THE COURT:  All right.  Again, any other witnesses in

14   this case, please withdraw from the courtroom.

15          MR. WITHERS:  Your Honor, and we have no witnesses --

16          THE COURT:  Thank you, Mr. Withers.

17          MR. WITHERS:  -- other than perhaps Mr. Williams.

18          MR. KUHLMAN:  Good morning, Your Honor.

19   Cameron Kuhlman for Mr. Hooper.  I'm just going to do a little

20   bit of my own housekeeping at this point if that's all right

21   with Your Honor.

22          THE COURT:  Yes, Mr. Kuhlman.

23          MR. KUHLMAN:  Thank you.

24          MR. HOWARD:  Well, actually, Minton, you're going to

25   be the first witness.

1          Your Honor, I would note the case agent, being exempt

2     from the rule, is at counsel table, Agent Kevin Jarriel.

3     Joining me is Dean Athanasopoulos, who is our litigation

4     support tech and who's going to help with some of the

5     presentation here from our office.

6          COURT CLERK:  Agent Minton, if you would, take the

7     stand.

8          THE WITNESS:  Yes, ma'am.

9          COURT CLERK:  And, sir, you have previously been

10    sworn, so, if you would, please, be seated.

11          State your name and occupation for the record.

12          THE WITNESS:  Yes, ma'am.  Agent Brent Minton,

13    M-i-n-t-o-n.  I'm currently assigned with the Chatham-Savannah

14    Counter Narcotics Team.

15                         BRENT MINTON,

16    having been previously sworn, was examined and testified as

17    follows:

18                       DIRECT EXAMINATION

19    BY MR. HOWARD:

20    Q.   Agent Minton, how long have you been with the Chatham

21    County Counter Narcotics Team?

22    A.   Since approximately January 2017.

23    Q.   And is that often referred to as CNT?

24    A.   Yes.

25    Q.   Were you with law enforcement before joining CNT?

1   A.    Yes.

2   Q.    Can you tell the Court a little bit about your experience

3   in law enforcement.

4   A.    Prior to CNT, I was assigned to the FBI's Violent Crimes

5   Task Force as a task force officer, and that's through my home

6   agency, Savannah Police Department.

7   Q.    And have you had several years' experience with

8   investigating narcotics cases?

9   A.    Yes.

10  Q.    Were you involved in the investigation into Omar Griffin,

11  Herman Williams, and others in this case?

12  A.    I was.

13  Q.    I want to turn your attention specifically to March 5th of

14  2018.

15        Were you working that day?

16  A.    Yes, I was.

17  Q.    And specifically, that day, did you see Herman Williams in

18  a car?

19  A.    I did.

20  Q.    What kind of car?

21  A.    It was a black Toyota Corolla.

22  Q.    And was there a traffic stop attempted of Herman Williams

23  that evening?

24  A.    Yes, there was.

25  Q.    And what happened after that traffic stop was attempted?

1   A.   Ultimately, he fled from the traffic stop.  Portions of

2   his flight included running a stop sign.  This was

3   approximately in the area of 45th and MLK Street in Savannah,

4   Georgia.  Continued to travel at a high rate of speed.  We were

5   fortunate enough to have helicopter support that was helping to

6   monitor aspects of the operation.

7   Q.   And did Mr. Williams eventually come to a stop?

8   A.   Yes.

9   Q.   Was he apprehended?

10   A.   After a short foot chase, yes, he was.

11   Q.   And who was chasing him?

12   A.   That -- myself.

13   Q.   And how was he apprehended?

14   A.   Physically.  He was chased.  I was able to catch up with

15   him, take him into custody.

16   Q.   And did you search him incident to arrest?

17   A.   Yes.

18   Q.   And was a phone found on him?

19   A.   Among other items, yes.

20   Q.   And do you recall what kind of phone?

21   A.   It was a Cricket ZTE cell phone.

22   Q.   And was that phone logged in to evidence?

23   A.   That's my understanding, yes.

24   Q.   Was there anyone else in the car Williams was driving?

25   A.   Yes.

1  Q.   And who was that?

2  A.   Omar Griffin.

3  Q.   And what happened to Omar Griffin?

4  A.   Ultimately, while I was in the process of taking

5  Mr. Williams into custody, Omar had also fled from the vehicle

6  that they were both occupying.  He was the passenger in that

7  vehicle.  They ultimately fled in similar directions.

8       And while I was otherwise occupied with Mr. Williams,

9  Omar Griffin emerged from the lane a short distance behind me.

10 I attempted to verbally confront him as I was still occupied

11 with Mr. Williams, and he ultimately fled on foot a second time

12 out of sight.  I was able to radio certain aspects of his path

13 of flight to other agents.

14 Q.   Okay.  And did he eventually get into a car and drive

15 away?

16 A.   Yes.

17 Q.   You mentioned the helicopter.

18      Were those events captured on video by helicopter?

19 A.   Yes.

20 Q.   And have you reviewed the video from that helicopter?

21 A.   Yes, I have.

22 Q.   Does it fairly and accurately depict Mr. Williams fleeing

23 from the traffic stop and his apprehension?

24 A.   Yes.

25           MR. HOWARD:  Your Honor, if I could approach.

16

1        THE COURT:  You may.

2   BY MR. HOWARD:

3   Q.   Agent Minton, I handed you a folder marked as Exhibit D to

4   Mr. Williams' phone suppression.

5        MR. HOWARD:  And I note for the record, Your Honor,

6   that within that contains a disc.

7   BY MR. HOWARD:

8   Q.   Agent Minton, do you recognize that disc?

9   A.   Yes.  It also has my initials after viewing it.

10  Q.   Okay.  And does that -- do you know the contents of that

11  disc?

12  A.   Yes.

13  Q.   And what is that?

14  A.   The helicopter surveillance footage from that evening.

15  Q.   Okay.  And one minor thing for the record.

16       On that disc, is there a password indicated there?

17  A.   Yes.

18  Q.   Okay.

19       MR. HOWARD:  And for the Court, I would note that

20  when we -- our office downloads various materials, it does

21  require it to be password protected.

22       On that disc, we put the password, to the extent that

23  the Court wants to access it.  I would note that that password

24  isn't -- is italicized, however.  When entering the password,

25  don't italicize it.

17

1          Okay.  I would move to admit Exhibit D to

2   Mr. Williams' phone suppression.

3          MR. WITHERS:  No objection.

4          THE COURT:  It's admitted without objection.

5          MR. HOWARD:  Your Honor, with permission, I'd ask

6   if we could pull that up and play that on the screen that's in

7   the courtroom.

8          THE COURT:  You may.

9      (Presentation of video started with pausing and playing as

10  directed by Counsel.)

11         MR. HOWARD:  When pulling this up, if we could . . .

12         All right.  If you could just pause it there.

13  BY MR. HOWARD:

14  Q.  And, Agent Minton, can you explain to the Court what we're

15  seeing here.  I'll note that it's paused.  Looking at the top

16  right-hand corner, it says Monday, March 5th, and 18:45.

17      And, Agent Minton, do you recognize what's depicted there?

18  A.  Yes.

19  Q.  Okay.  What's on the left side of the screen?

20  A.  That's going to be the actual FLIR, or night vision,

21  footage, heat signature footage of the helicopter.

22  Q.  What's on the right side of the screen?

23  A.  Simple mapping database used to track the activities of

24  the helicopter and what they're actively tracking.

25  Q.  All right.

1          MR. HOWARD:  And if we could skip ahead to 18:56.

2          And I'm noting, when I say "18:56," the number at the

3     top right-hand corner at the time, not the time of the video at

4     the bottom.  18:56.

5          THE COURT:  While he's advancing, let me ask the

6     witness a question, if I may.

7          The crosshair reticles in both parts, are they

8     supposed to represent the same location?  So, in other words,

9     where you see the crosshairs on the video and you see the

10    crosshairs on the map, are those supposed to be the same place?

11         THE WITNESS:  I believe what you're seeing is you see

12    the two circles.  One of the circles represents the helicopter

13    and its approximate position in reference to what they're

14    attempting to target, which was the second circle, or what you

15    can kind of see is purplish at this point.  I'm not exactly

16    sure if the crosshairs is more representative just centering of

17    the map itself.

18         THE COURT:  Thank you.

19    BY MR. HOWARD:

20    Q.   All right.  Now that we're playing now at the 18:56

21    minute, do you recognize the vehicle?

22    A.   Yes.

23    Q.   And which vehicle is that?

24    A.   It's going to be the vehicle that's about to make a turn

25    in just a second.  Turn signal is illuminated right now.  And

1    that would be the black Corolla.  This is going to be a SPD --

2              MR. HOWARD:  If we could pause it right there.  Okay.

3    A.   -- SPD marked unit that's now showing up in the frame of

4    the footage.

5    BY MR. HOWARD:

6    Q.   Okay.  And is that in the, kind of, middle to left-hand

7    side of the screen?

8    A.   Yes, sir.  That would be 45th Street.  And he's currently

9    on Burroughs traveling southbound.

10             MR. HOWARD:  Go ahead.

11   BY MR. HOWARD:

12   Q.   And what's happening now?

13   A.   The marked unit has been radioed to initiate the traffic

14   stop.  Mr. Williams is making a eastbound turn onto 50 -- or

15   45th Street.

16   Q.   And are the lights on for the --

17   A.   And now he's speeding up.  You can actually see me coming

18   to -- that's my vehicle right there that he's just passed, and

19   he is now continuing to flee.

20   Q.   All right.  When you say "flee," was -- the marked unit,

21   did it turn its lights on?

22   A.   Yes.

23   Q.   Okay.  In response to that, he fled?

24   A.   Yes.

25             MR. HOWARD:  If we could, (inaudible).

1  BY MR. HOWARD:

2  Q.   And can you describe what's happening now?

3  A.   He's continued to exit the area probably unaware that

4  there's a helicopter above head.  Helicopter is relaying

5  information to myself and other ground units that are

6  attempting to keep up with the surveillance.

7       At this point, it appears Mr. Williams is turning into a

8  lane.  Shortly, you'll see him lose control of the vehicle and

9  veer off into a fence.  That's occurring right there.

10          MR. HOWARD:  If we could, stop it there.

11  BY MR. HOWARD:

12  Q.   All right.  We're stopping now at the 18:58:17-second

13  mark.

14       Can you describe what's happened and what's depicted now

15  in the video?

16  A.   At this point, Mr. Williams crashed out into a fence.

17  When the video restarts, you'll see that the operator of the

18  camera system in the helicopter turns on the FLIR, or the heat

19  signature device, to better track the bodies as they now flee

20  from the vehicle.

21          MR. HOWARD:  Keep going.

22  BY MR. HOWARD:

23  Q.   And what's happening now?

24  A.   That's Mr. Williams and Mr. Griffin fleeing from the

25  vehicle on foot.  That's my vehicle right there.

1           MR. HOWARD:  All right.  If we could stop right --

2     A.    Visually --

3           MR. HOWARD:  And just for the record, we'll note that

4     we're now stopped at 18:58:36.

5     BY MR. HOWARD:

6     Q.    And you say that's your vehicle right there.

7           What are you (inaudible)?

8     A.    The vehicle that's pulled off to the right of the road,

9     that's my CNT vehicle -- unmarked vehicle.  But I observed

10    Mr. Williams at that point emerging from a cut between the

11    houses.  He's essentially running in a south -- southern flight

12    path and just happened to come across me.

13          Shortly after observing him come through the house, he

14    starts to turn back west onto 52nd Street, and that's when I

15    get out of my vehicle, immediately begin to give loud, verbal

16    commands, "Please stop," in attempt to further apprehend him.

17    Q.    And what's happening now?

18    A.    He's continuing to flee on foot, now turning back north

19    onto -- I believe that's Hopkins Street.

20          Shortly, you'll see that the apprehension takes place at

21    this point.

22          MR. HOWARD:  All right.  And, now, if we could stop

23    it at the 18:59:09 mark.

24    BY MR. HOWARD:

25    Q.    And describe what's happening there.

1    A.    I'm taking Mr. Williams into custody at that point.  Once

2    the video starts, you'll see that the camera then shifts as I

3    believe that they observed that Mr. Griffin is now coming into

4    view.

5    Q.    And let me know when you see Mr. Griffin appear on the

6    screen.

7    A.    I believe you could just start to see him coming out of

8    the lane on foot.  That would be off to the south of my

9    location.  Now the camera's starting to see him, and that would

10   be him right there emerging.

11   Q.    And we're at the 18:59:38 mark, and you can see

12   Mr. Griffin running there?

13   A.    Yes.

14   Q.    And now, can you describe -- we're now at the

15   19-minute-and-5-second mark.

16        Can you describe what's happening?

17   A.    Mr. Griffin has gotten into my vehicle and is now fleeing.

18   Q.    And to your knowledge, has Mr. Griffin been apprehended

19   since then?

20   A.    No.

21        MR. HOWARD:  I have no further questions of this

22   witness, Your Honor.

23        THE COURT:  Thank you, Mr. Howard.

24        Mr. Withers?

25        MR. WITHERS:  Just very briefly, Your Honor.

1          CROSS-EXAMINATION

2   BY MR. WITHERS:

3   Q.    Agent Minton, you mentioned that -- in taking Mr. Williams

4   into custody, that you had seized from him the Cricket ZTE cell

5   phone?

6   A.    Yes, sir.

7   Q.    And when you took him into custody, that was, for want of

8   a better word, tackling him in that pursuit there; true?

9   A.    I didn't end up having to tackle him.  There was more or

10  less a trip, skip, fall, and --

11  Q.    Okay.

12  A.    -- and making contact.

13  Q.    And y'all -- the two of you went to the ground?

14  A.    Yes.

15  Q.    And in terms of the seizure of the -- and you mentioned a

16  cell phone and other items, when did that take place?

17  A.    All the items that I accounted for being on his person

18  remained with him until he was transported by an SPD unit back

19  to our headquarters.  All those items were still maintained

20  with him once he arrived at our offices.  And it wasn't until

21  he was processed and sent to CCDC that those items were

22  officially seized and taken from him.

23  Q.    And --

24  A.    That's my understanding.

25  Q.    Okay.  So fair to say, then, you were not the one who

1  actually physically removed those items from him; is that

2  accurate?

3  A.   No.  Every -- everything that I accounted for being on his

4  person remained with him.

5  Q.   Okay.  And in terms of -- and I'm not trying to belabor

6  the point, but in terms of what you say, everything that you

7  accounted for did remain with him, is there a property form

8  that you filled out at the scene?

9  A.   No.  Particularly given the circumstances -- and we had

10  another individual, and he's, again, fleeing and has now stolen

11  a vehicle -- it was mainly to account for what I knew -- I was

12  going to be able to essentially testify later, "These were the

13  items that were present on him at the time I took him into

14  custody," and also to be relayed to case agents down the road

15  as far as, like, these items were with him.

16       But also for officer safety purposes, I wanted to ensure

17  that he didn't have weapons still on him --

18  Q.   Sure, sure.

19  A.   -- or any weapons that -- I was about to turn him over to

20  another officer/agent -- that he would have on his person.

21  Q.   Understood.  There's no inventory that you do in terms of,

22  you know, search incident to arrest at the scene; true?

23  A.   Other than writing an official report that would account

24  for those, there -- no.

25  Q.   Okay.  And then he's taken back to the CNT.

25

1       And is it the -- at CNT where the property receipt form is

2   filled out before he's transported to CCDC?

3   A.   If one were to be filled out, it could be filled out at a

4   variety of locations.  Some people aren't arrested or taken

5   into custody and transported, and we might fill out a property

6   receipt for those instances.

7       But if somebody's being arrested and we're seizing those

8   items, if we intend to forfeit them, there will be a property

9   report that is completed, and that's completed within 24 hours

10  of their arrest and processed.

11      But if he's being arrested and items are going to be

12  seized from him, it's noted in reports, and he's not

13  necessarily going to receive a property receipt that -- I think

14  is what you're asking.

15  Q.   Yeah.  I'm actually not talking so much, Agent Minton,

16  about a property receipt that you may give him but a property

17  receipt that y'all will fill out for purpose of recording what

18  was seized from him and when.

19  A.   That primarily occurs through reports and then the

20  forfeiture forms that we complete.

21  Q.   Okay.  So there's not an independent -- if I'm looking

22  for an independent property receipt of what's seized from

23  Mr. Williams on March 5, 2018, I'm not going to find one other

24  than your report?

25  A.   Correct.

1    MR. WITHERS:  I think that's all the questions I've

2  got of this agent.  Thank you.

3    THE COURT:  All right.  Thank you.

4    Any redirect, Mr. Howard?

5    MR. HOWARD:  Yes, briefly.

6                  REDIRECT EXAMINATION

7  BY MR. HOWARD:

8  Q.   Regarding, kind of, property receipts, there are evidence

9  forms that CNT creates --

10 A.   Yes.

11 Q.   -- correct?

12     And those evidence forms assign an exhibit number to

13 certain exhibits?

14 A.   That's correct.

15 Q.   They also describe who the owner of that evidence was

16 obtained from; correct?

17 A.   That's correct.

18     MR. HOWARD:  Your Honor, if I could approach the

19 witness.

20     THE COURT:  You may.

21 BY MR. HOWARD:

22 Q.   I'm handing you a two-page document, and I'd ask you to

23 look at Page 2.

24 A.   Yes, sir.

25 Q.   And is there -- do you recognize that document?

1    A.   Yes, I do.

2    Q.   What is that?

3    A.   This is our evidence log -- evidence form.

4    Q.   Okay.  And on that evidence form, do you see a ZTE cell

5    phone?

6    A.   I do.

7    Q.   And what is the exhibit number for that?

8    A.   The exhibit number is HWRRN6.

9    Q.   Okay.  And is the owner listed there?

10   A.   Yes.

11   Q.   And what's the description of that evidence that was

12   logged in as being (inaudible)?

13   A.   A ZTE cell phone with a model and a serial number, if you

14   want me to read those as well.

15   Q.   No.  It's okay.

16         MR. HOWARD:  Your Honor, I would -- what I can do is

17   mark that.  And I'll mark it as Government's Exhibit Z to the

18   phone suppression motion.  This was not an exhibit that was

19   attached to -- it has been produced in discovery, but it was

20   not attached to the Government's filings.  So I can mark it as

21   Exhibit Z.  And at this time, I would move for its admission.

22         MR. WITHERS:  No objection.  We have received it in

23   discovery, Your Honor.

24         THE COURT:  Exhibit Z is admitted without objection.

25         MR. HOWARD:  I have no further questions, if I could

1   go up there and just mark it.

2          THE COURT:  You may.

3          MR. HOWARD:  Thank you.

4       (Government's Exhibit Z was marked for identification.)

5          MR. HOWARD:  I have no further questions for

6   Agent Minton, Your Honor.

7          MR. WITHERS:  If I can briefly follow up on that,

8   Your Honor.

9          THE COURT:  Of course, Mr. Withers.  Let's just let

10  Mr. Howard finish his marking and get him out of there, and

11  then you can take over.

12         Go right ahead.

13                    RECROSS-EXAMINATION

14  BY MR. WITHERS:

15  Q.   Agent Minton, looking at Exhibit E --

16         MR. WITHERS:  And would the Court like me to provide

17  a copy to Your Honor?

18         THE COURT:  Please.

19         THE WITNESS:  I'm sorry.  What -- what exhibit did

20  you state?

21         MR. WITHERS:  Z.

22         MR. HOWARD:  Z.

23         THE WITNESS:  Z.

24         MR. WITHERS:  Right?

25         MR. HOWARD:  Yeah.  That's -- the one I provided is

29

two pages.

MR. WITHERS:  Okay.

MR. HOWARD:  You can take a look if you want to confirm.

THE COURT:  Mr. Withers, if you want to retrieve the exhibit from the witness and take a look at it, you may.

MR. WITHERS:  Thank you, Your Honor.

Let's just look at the second page, if we can.  I just want to be able to provide the Court with a copy of what the witness is looking at to make sure that --

THE WITNESS:  It matches up?

MR. WITHERS:  -- what time -- looking that it matches up.  And if it does, I want to ask you to provide a copy to the Court.

THE WITNESS:  Yes, sir.  It looks . . .

MR. WITHERS:  Okay.  If I could retrieve that.

THE COURT:  You may.

MR. WITHERS:  And may I deliver this to Your Honor?

THE COURT:  You may.  Just give it to Ms. Flanders, if you would.

BY MR. WITHERS:

Q.   And just for purposes of the record, that's Exhibit Z you're looking at --

A.   Yes, sir.

Q.   -- Agent Minton, and then Page 2 of Exhibit E --

30

1    A.    Correct.

2    Q.    -- in particular; is that correct?

3          And what -- as I understand it looking back at this log,

4    this is a multi-page log.

5          I mean, it's probably 20, 25, 30 pages, is it not?

6    A.    Yeah.  There's over 200 pieces of evidence that were --

7    Q.    Right.  And as I understand it, this is a log of all of

8    the evidence seized during the course of y'all's multi-month

9    investigation; is that fair to say?

10   A.    Yes.

11   Q.    Now, with respect to Page 2, it identifies the ZTE cell

12   phone; correct?

13   A.    Noting that there are -- there is more than one

14   Cricket ZTE cell phone that has been documented on this page,

15   yes.

16   Q.    Okay.  Turning your attention to what Mr. Howard was

17   referring to -- and that's the second entry; correct?

18   A.    Yes.

19   Q.    All right.  So we're on the same entry.  That's the second

20   entry.

21         And it shows that the owner is Herman Williams; correct?

22   A.    Yes, sir.

23   Q.    There's nothing in here that indicates who the seizing

24   officer was, is there?

25   A.    Not on this, no, sir.

1   Q.   Okay.  And in terms of the receipt number, in other words,

2   a property receipt number that would match up to this master

3   list, there's nothing -- that receipt number is blank, is it

4   not?

5   A.   Are you talking about the exhibit number, or are you

6   making a distinction between the two?

7   Q.   See where it says "Receipt Number," middle column, top?

8   A.   Yes.

9   Q.   That's blank, is it not?

10  A.   Where the particular entry is for receipt number, yes,

11  that is blank.

12  Q.   Okay.

13          MR. WITHERS:  May I approach the witness, Your Honor?

14          THE COURT:  You may.

15  BY MR. WITHERS:

16  Q.   Agent Minton, one of the things you talked about was

17  that -- in seizing some things, that, on occasion, there may

18  be -- the only record of what is seized is reflected in the

19  report.

20      Did I understand your testimony to be correct in that

21  respect?

22  A.   Yes, that agents, in the process of taking items, seizing

23  items, particularly when there's a mass of agents that are

24  going to be --

25  Q.   Okay.

32

1    A.    -- conducting those, there should be some report that

2    identifies that, yes.

3    Q.    All right.  And just so I understand, at the scene,

4    you're not taking out the cell phone that's identified here in

5    Government Exhibit C -- Z -- excuse me -- as in zebra, and

6    looking at it and writing down the brand, model, and serial

7    number; true?

8    A.    I'm not getting model numbers, serial numbers, no.

9    Q.    Okay.  And then I've handed you what's been marked as

10   Defense Exhibit 1.

11        That's a report that you did concerning the apprehension

12   of Herman Williams, is it not?

13   A.    Yes, sir.

14   Q.    It's dated March 5, 2018, is it not?

15   A.    Yes.

16   Q.    And it has an entry date and time up in the top right-hand

17   portion of 3/5/2018, 0700.

18   A.    Uh-huh.

19   Q.    Is that accurate?

20   A.    That -- that's what the form does state, yes.

21   Q.    All right.  That would not be a time that you prepared

22   this report, or would it be?

23   A.    No, sir, that would not.

24   Q.    Okay.  Because the time of the events would have been

25   right around that hour (inaudible)?

1    A.    Oh, yeah.   The report would obviously have been written

2    sometime after this event.

3    Q.    And looking at this report that's entitled "Apprehension

4    of Herman Williams," is there anything here that indicates the

5    seizure of cell phone from Mr. Williams at the time of his

6    apprehension?

7    A.    No.   And as I stated, primarily for the purposes that I

8    didn't take anything, remove anything from him other than to

9    identify for my personal sake and to relay to the case agent,

10   nothing was taken from him, so I didn't state that anything was

11   seized from him --

12   Q.    So --

13   A.    -- for that purpose.

14   Q.    And so -- just so I understand what's going on out at the

15   scene and then after he's taken to CNT, it's somebody else

16   that's going to actually remove those items from him?

17   A.    Potentially.   And usually, that's something that's

18   coordinated with the case agent.   Are these items that you need

19   for the much broader or larger case?   So it's particularly why

20   I'm not taking items from him.   And I imagine the next agent

21   that was sitting with him once he was at CNT hadn't necessarily

22   removed those items until conferring with the case agents.

23   Q.    Uh-huh.   And then that agent or agents is going to do an

24   actual report, "I seized these items from Mr. Williams"?

25   A.    I -- that would be my expectation.

1          MR. WITHERS:  Okay.  Thank you.

2          Nothing further, Your Honor.

3          THE COURT:  May this --

4          MR. HOWARD:  Nothing from the Government, Your Honor.

5          THE COURT:  All right.  You may step down,

6     Mr. Minton.  Thank you.

7          Mr. Withers, may Mr. Minton remain in the courtroom,

8     or --

9          Is it anticipated he's going to testify again,

10    Mr. Howard?

11         MR. HOWARD:  No, Your Honor.

12         MR. WITHERS:  Your Honor, I would ask that he remain

13    under the rule --

14         THE COURT:  That's fine.

15         MR. WITHERS:  -- with the other --

16         THE COURT:  That's why I'm inquiring.

17         Mr. Minton, if you would, please leave -- please

18    leave the courtroom, Mr. Minton.

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Thank you.

21         MR. HOWARD:  The Government calls Agent

22    Gary Woodruff.

23         COURT CLERK:  Sir, please come forward and take the

24    stand.

25         You have previously been sworn.  If you would, please

1    be seated.

2              State your name and your occupation for the record.

3              THE WITNESS:  My name is Agent Gary Woodruff, and I'm

4    assigned to the Chatham-Savannah Counter Narcotics Team.

5                           GARY WOODRUFF,

6    having been previously sworn, was examined and testified as

7    follows:

8                         DIRECT EXAMINATION

9    BY MR. HOWARD:

10   Q.   How long have you been an agent with CNT?

11   A.   About 5 years now.

12   Q.   On the evening of March 5th, 2018, were you asked to

13   assist in finding an abandoned car?

14   A.   I was.

15   Q.   Were you given any information about the events that led

16   to that car being abandoned?

17   A.   I'd heard radio traffic that there was a vehicle fleeing

18   from a traffic stop.

19   Q.   And were you given an approximate location about where it

20   was found?

21   A.   Yes.

22   Q.   Okay.  And do you recall where that was?

23   A.   Not exactly.  It was in a lane not too far from our

24   office.

25   Q.   And did you ultimately find that car?

36

1    A.    Yes.

2    Q.    What kind of car was it?

3    A.    It was a black Toyota Camry.

4    Q.    It was a Camry?

5    A.    Camry or Corolla.  They both look alike to me.

6    Q.    And can you describe how that Toyota sedan appeared when

7    you found it?

8    A.    It was parked up against a fence like it had ran into the

9    fence.  The lights were on, and the engine was running, and it

10   had scratch marks down the right side.  And so I checked the

11   lane, and I could see where it had swerved, hit some garage

12   cans, and then crashed into the fence.

13   Q.    Was there anyone in the car that you could see?

14   A.    No.

15   Q.    Were you able to determine if it was locked or unlocked?

16   A.    It was unlocked.

17   Q.    If we could show what's already been admitted as

18   Exhibit D, and if we could go to the 18:58 mark.

19         (Presentation of video started with pausing and playing as

20   directed by Counsel.)

21              MR. HOWARD:  If we could pause it right there.

22   BY MR. HOWARD:

23   Q.    So we've now stopped at what's been marked as --

24   what's been admitted as Exhibit D, and we stopped at the

25   18:58:17 mark.

1          Do you recognize what's depicted in that video?

2     A.    That would be the vehicle.  At least that's the position

3     that we found in it when we found it.

4     Q.    Okay.  And you recognize that as the vehicle that you

5     found on the evening of March 5th, 2018?

6     A.    Yes, sir.

7               MR. HOWARD:  No further questions for this witness,

8     Your Honor.

9               THE COURT:  All right.  Mr. Withers, any cross?

10              MR. WITHERS:  No, Your Honor.

11              THE COURT:  All right.  You may step down -- step

12    down, Mr. Woodruff.  I'd ask you to please exit the courtroom.

13              THE WITNESS:  Yes, sir.

14              MR. HOWARD:  Your Honor, the Government calls

15    Officer Barry Ripley.

16              COURT CLERK:  Sir, you have previously be sworn.  If

17    you would, please be seated.

18              State your name and occupation for the record,

19    please.

20              THE WITNESS:  Barry Ripley, R-i-p-l-e-y.  I'm a task

21    force officer with DEA from Savannah Police.

22                         (No omissions)

23

24

25

1                          BARRY RIPLEY,

2    having been previously sworn, was examined and testified as

3    follows:

4                          DIRECT EXAMINATION

5    BY MR. HOWARD:

6    Q.    And how long have you been with DEA?

7    A.    Since February of 2018.

8    Q.    And what did you do before DEA?

9    A.    I was assigned to the Chatham-Savannah Counter Narcotics

10   team for 6 years.

11   Q.    And how about before that?

12   A.    I worked vice, like street-level narcotics, for a plain

13   clothes unit within Savannah Police.

14   Q.    And how long did you do that?

15   A.    Approximately 3 years.

16   Q.    Have you had training and experience investigating drug

17   trafficking organizations?

18   A.    I have.

19   Q.    And you drafted a search warrant affidavit dealing with

20   some cell phones in this case; correct?

21   A.    I did.

22   Q.    And is that training and experience detailed in

23   Paragraph 3 of the search warrant affidavit?

24   A.    It is.

25         MR. HOWARD:   And, Your Honor, looking at -- if I

1    could approach.

2              THE COURT:  You may.

3    BY MR. HOWARD:

4    Q.   Officer, I've handed you what's been marked as Exhibit A

5    to the Government's response to the phone suppression motion.

6    Could you review that.

7    A.   (Complied.)  Yes, sir.

8    Q.   Do you recognize that?

9    A.   I do.

10   Q.   What is that?

11   A.   It's a search warrant for 22 cellular phones.

12             MR. HOWARD:  Okay.  And I'd move to admit

13   Government's Exhibit A.

14             MR. WITHERS:  I think it's part of the court record,

15   but we have no objection.

16             THE COURT:  Exhibit A is admitted without objection.

17   BY MR. HOWARD:

18   Q.   Now, Officer Ripley, are you familiar with the case

19   involving Omar Griffin, Herman Williams, and others?

20   A.   I am.

21   Q.   And did you participate in the investigation of this case?

22   A.   I did.

23   Q.   Were you also involved in the seizure of 25 kilograms of

24   cocaine on March 5th, 2018?

25   A.   Yes, sir.

40

1   Q.   And is it fair to describe this as a complex

2   investigation?

3   A.   Correct.

4   Q.   Can you talk a little bit about the complexity of this

5   investigation?

6   A.   Yes, sir.  It's a cocaine conspiracy -- cocaine and

7   marijuana.  We utilized several different investigative

8   techniques: wiretaps, video surveillance, physical

9   surveillance, controlled buys, cell phone analysis.

10  Q.   Was there pole cameras also utilized?

11  A.   There was.

12  Q.   Was there the obtaining of pen register/trap and trace and

13  cell site location information on approximately 15 different

14  numbers?

15  A.   Yes, sir.

16  Q.   You mentioned wiretaps.

17       How many different wiretaps were there?

18  A.   Five.

19  Q.   You mentioned physical surveillance.

20       Were there controlled purchases as well?

21  A.   There were.

22  Q.   Cooperating individuals?

23  A.   Yes.

24  Q.   Were there drugs maintained at various premises?

25  A.   There were.

1   Q.   Was there also a financial investigation component to this
2   as well?
3   A.   Yes, sir.
4   Q.   Can you talk a little bit about the number of defendants
5   who were ultimately charged in this case?
6   A.   Yes, sir.  We had an indictment of 14 defendants ranging
7   from high-ranking members of the organization to lower members
8   to middle members, couriers, those tasked with logistics,
9   mid-level dealers, upper-echelon dealers.
10  Q.   And did this -- well, you talk about a conspiracy.
11       Was it short in duration, or was it a lengthy conspiracy
12  that was being investigated?
13  A.   It was lengthy.
14  Q.   It spanned several years?
15  A.   Correct.
16  Q.   Was it isolated to Savannah, or did it involve other
17  locations?
18  A.   It spanned from Savannah to Atlanta to California and to
19  Houston.
20  Q.   All right.  So it's extensive in terms of its duration,
21  in terms of the locations, the number of persons, the
22  investigative techniques, all of that?
23           MR. WITHERS:  Your Honor, I know it's a hearing.
24           THE COURT:  Sustained.  That is -- that is a little
25  bit of a leading question.

42

1    Please rephrase, Mr. Howard.

2    MR. HOWARD:  Understood.

3    BY MR. HOWARD:

4    Q.   All of those factors that you identified, do those add to

5    the complexity of the investigation?

6    A.   They did.

7    Q.   Was Herman Williams arrested on March 5th, 2018?

8    A.   He was.

9    Q.   And you've learned this in the course of the

10   investigation; correct?

11   A.   Yes.

12   Q.   And has he remained in custody since that date?

13   A.   Yes.

14   Q.   To your knowledge, has he asked for any of his phones

15   back?

16   A.   No, not to my knowledge.

17   Q.   And had he requested the phones back from law enforcement,

18   is that something that would have percolated to you?

19   A.   It would have, yes.

20   Q.   So after his arrest on March 5th, do you know where he was

21   held at?

22   A.   Chatham County Jail initially, and then I believe he was

23   moved to Bulloch.

24   Q.   Okay.  And he's been at those locations since the time of

25   his arrest; correct?

43

1   A.   Yes.

2   Q.   And does Chatham County Jail allow inmates to have cell

3   phones?

4   A.   No, sir.

5   Q.   Does Bulloch County Jail allow inmates to have cell

6   phones?

7   A.   No.

8   Q.   Based on your training and experience investigating

9   narcotics cases, is it common for drug traffickers to have

10  multiple cell phones?

11  A.   Yes, sir.

12  Q.   Why is that?

13  A.   Normally, to try to evade law enforcement attempts at

14  electronic surveillance.

15  Q.   Now, in the -- and multiple cell phones helps them do

16  that?

17  A.   Yes.

18  Q.   In the course of this investigation, did the targets

19  of the case use cell phones to arrange the distribution of

20  narcotics?

21  A.   They did.

22  Q.   And did you obtain the subscriber information for various

23  cell phones?

24  A.   We did.

25  Q.   Did -- generally in this case, did the individuals

1   subscribe their own name to their cell phones?

2   A.   No.

3   Q.   What advantage does it have in using someone else's name

4   as a subscriber?

5   A.   Just provides anonymity.  You can remain anonymous.

6   Q.   There were a number of targets in this investigation;

7   correct?

8   A.   Yes.

9   Q.   Was Herman Williams one of them?

10  A.   He was.

11  Q.   And in the course of the investigation, were several

12  phones believed to have been used by Herman Williams?

13  A.   Yes.

14  Q.   Were those phones listed as Devices 1 and 14 in your

15  search warrant affidavit, which is Exhibit A?

16  A.   Yes, sir.

17  Q.   And before Williams' arrest, had law enforcement obtained

18  court authorization to obtain his cell phone location data?

19  A.   Yes.

20  Q.   And for Devices 1 and 14, do you recall approximately when

21  law enforcement obtained that -- those authorizations?

22  A.   I believe February.

23  Q.   Okay.  For both Device 1 and Device 14, it was February

24  authorization for both of those; correct?

25  A.   I believe so, yes.

45

1   Q.   And was that location data used to locate Herman Williams

2   on the date of the arrest?

3   A.   It was.

4   Q.   Do you know specifically -- when you're talking about

5   Device 1 and Device 14, do you know which device law

6   enforcement was using to locate him?

7   A.   Not sure.

8   Q.   In the course of this investigation, did you come to learn

9   where Device 1 and Device 14 were located?

10  A.   Yes.

11  Q.   And where was that?

12  A.   Device 1 was located in the back seat of the Toyota

13  Corolla behind the driver's side.

14  Q.   And where was Device 14?

15  A.   On the person of Herman Williams.

16  Q.   So finding Device 1 and Device 14 in the car and on

17  Williams, did that give them evidentiary value?

18  A.   Yes, sir.

19  Q.   Why is that?

20  A.   As Herman being one of the subjects of the

21  investigations -- and, obviously, we're using a ping on the

22  cellular phone -- that's evidence of what's going on as well

23  as how we're locating him.

24  Q.   And does it help link the phone to the person?

25  A.   Yes.

1   Q.   And it was -- was it evidence linking Williams to that
2   narcotics conspiracy?
3   A.   Yes.
4   Q.   Those devices, 1 and 14, did you intend to maintain those
5   in evidence?
6   A.   Yes.
7   Q.   And you weren't going to just give them back to
8   Mr. Williams; correct?
9   A.   Correct.
10  Q.   All right.  So in the course of this investigation, were
11  you and Agent Jarriel working on this investigation together?
12  A.   Yes.
13  Q.   Who was the original case agent?
14  A.   Agent Jarriel.
15  Q.   Was there a different original case agent from DEA
16  assigned to this?
17  A.   Yes.  It was James Jaskolka.
18  Q.   Okay.  And where is Mr. -- is Mr. Jaskolka still with DEA?
19  A.   No, sir.  He's retired.
20  Q.   Okay.  And approximately when did he retire?
21  A.   June.
22  Q.   Of what year?
23  A.   2018.
24  Q.   Now, Mr. Williams, we talked about, was arrested on
25  March 5th; correct?

1    A.   Yes, sir.

2    Q.   Is it fair to say that, you know, after his arrest, this

3    was a pretty hectic time for the investigation?

4    A.   Very.

5    Q.   And why is that?

6    A.   Just numerous things going on.  There's other search

7    warrants that need to be executed that took a lot of planning

8    and preparation and coordination with not just the DEA office

9    but CNT, Savannah Police, Savannah SWAT; you know, the building

10   of arrest -- or obtaining arrest warrants, things of that

11   nature.

12   Q.   And the day Mr. Williams was arrested, there was a large

13   cocaine seizure; right?  We talked about that?

14   A.   Yes.

15   Q.   And had CNT ever had a cocaine seizure that large before?

16   A.   No.

17   Q.   Were -- all of the targets on March 5th, were they all in

18   custody?

19   A.   No.

20   Q.   And even as we stand here today, are a number of them

21   still fugitives in this case?

22   A.   Yes, yes.

23   Q.   So starting on March 5th, up to the date of the search

24   warrant affidavit, which is Exhibit A and I believe dated,

25   then, towards the end of July, can you tell the Court a little

1    bit about what was done as it relates to this investigation in

2    the days and months after Mr. Williams' arrest.

3    A.    So the rest of March, we obviously focused on doing some

4    of those search warrants and arrest warrants for other members

5    of the conspiracy.  Moving into April, we traveled out to

6    Houston to conduct some interviews of some witnesses out there

7    that may could help us.

8          May, we continued to analyze phone records and things of

9    that nature for people that were still outstanding that

10   surveillance had revealed weren't in their normal locations.

11   We went to grand jury, obtained federal indictments, and just

12   continued to work on getting a roundup ready to go serve the

13   federal indictments on those that were in custody but also

14   those who were outstanding, which would -- to no avail.  We

15   have -- still have three fugitives.  So we have spent a lot of

16   time attempting to locate them.

17   Q.    Okay.  And you mentioned there were a number of different

18   warrants and search warrants and arrests.  Let's talk a little

19   bit about those.

20         Was there a warrant done for the cars of Omar Griffin and

21   Herman Williams?

22   A.    Yes, there were.

23   Q.    Were those warrants executed?

24   A.    They were.

25   Q.    Was there an arrest warrant for Justin Swinton in this

49

1  case?

2  A.    Yes.

3  Q.    And was that warrant executed?

4  A.    It was.

5  Q.    Was there a search warrant for Mr. Swinton's residence?

6  A.    Yes.

7  Q.    Was there an arrest warrant for Allen Grady?

8  A.    Yes.

9  Q.    Was there a search warrant for Mr. Grady's residence?

10  A.    Correct.

11  Q.    Was there a search warrant for Omar Griffin's apartment in

12  Pooler?

13  A.    Yes.

14  Q.    How about for his residence in Atlanta?

15  A.    There was.

16  Q.    Was there an arrest warrant for Barrington Miller?

17  A.    Yes.

18  Q.    A search of Vincent Hooper's house?

19  A.    Correct.

20  Q.    A search warrant for Desmond Jones' truck and trailer?

21  A.    Yes.

22  Q.    A search warrant for Mr. Williams' residence on Central

23  Avenue?

24  A.    Yes.

25  Q.    And a search warrant for Mr. Ramsey's residence on

1    West 45th Street?

2    A.    Correct.

3    Q.    So can you talk a little bit about a number of different

4    warrants: search warrants, arrest warrants?  Can you talk a

5    little bit about the resources necessary to both draft and then

6    execute these warrants?

7         For instance, is it just -- when there's an arrest warrant

8    or a search warrant, is it one agent going out there and doing

9    it?

10   A.    No, absolutely not.

11   Q.    Okay.  Can you talk a little bit about that?

12   A.    Yes.  Due to some of the lengthy criminal histories for

13   some of the conspirators, there definitely was a safety

14   concern, so Savannah SWAT was used to execute the warrant on,

15   I believe, at least three residences.  It takes a lot of

16   coordination, a lot of planning not just on our part but their

17   part as well and -- to have enough people be able to do

18   simultaneous warrants.  There were some that were done at the

19   same time.

20        They're required to have CNT available and DEA office here

21   as well and coordination with marked police units.  You know,

22   they're responsible for riding calls on the street.  We had to

23   use some of their resources.

24   Q.    So why did you prioritize those search and arrest warrants

25   as opposed to just giving a search warrant for the device --

51

1    phones in this case?

2    A.   All these other things needed to be prioritized ahead of

3    the phones due to the phones being evidence and being logged

4    into evidence.  There was no intentions of turning them over

5    because they would be there.  These other things, you know,

6    could move, could leave.  People can flee.  Evidence can flee

7    from homes that aren't secured, so . . .

8    Q.   And particularly in narcotics investigation, is there an

9    acute risk of tangible evidence being destroyed?

10   A.   It's a big risk, yeah.

11   Q.   Can you talk a little bit about that?

12   A.   Obviously, if people know that co-conspirators or people

13   they're involved in an organization with have been arrested by

14   law enforcement, evidence gets destroyed, narcotics gets moved,

15   things of that nature.

16   Q.   And after Mr. Williams' arrest on March 5th, did you

17   intercept calls in this case among co-conspirators discussing

18   potential destruction of evidence?

19   A.   Yes.

20   Q.   And were there also calls among co-conspirators where they

21   indicated that they were going to get out of town?

22   A.   Yes.

23   Q.   You mentioned a trip to Houston that you took.

24        What month was that?

25   A.   April.

52

1    Q.    Okay.  And what was the purpose of that trip to Houston?

2    A.    To interview a witness, Paul Stephenson.

3    Q.    Okay.  And was that related to this investigation?

4    A.    It was.

5    Q.    Did you travel alone, or were there other agents?

6    A.    There was other agents.

7    Q.    Okay.  And so whenever you're doing search warrants,

8    whenever you're doing interviews, it's not just you alone, but

9    it's a tax of resources; correct?

10   A.    Yes.

11   Q.    Were there also efforts undertaken to track fugitives in

12   this case?

13   A.    Yes, there were.

14   Q.    And can you talk a little bit about that?

15   A.    Yes.  There was multiple interviews done with family

16   members of those who had fled in an attempt to try to identify

17   where the fugitives were.  Surveillance was done in conjunction

18   with that, physical surveillance, meaning watching locations

19   that we were familiar with to see if the fugitives were there

20   or still residing there.

21   Q.    And to talk about the physical surveillance, was there

22   also analysis of electronic evidence to try to identify some of

23   these fugitives?

24   A.    Correct.

25   Q.    Was one of the fugitives Omar Griffin?

53

1   A.   Yes.

2   Q.   Would you describe that as a dangerous individual?

3   A.   Yes.

4   Q.   Lengthy criminal history?

5   A.   Correct.

6   Q.   And certainly one of the leaders of this organization;

7   right?

8   A.   Yes, sir.

9   Q.   You also mentioned that you were getting ready to prepare

10  for the indictment in June; is that right?

11  A.   Yes.

12  Q.   Can you talk a little bit about what goes into that?

13  A.   Yes.  Just reviewing phone calls and, obviously, lengthy

14  meetings with the AUSA to go over the charges and what needs to

15  be indicted, what evidence of those crimes we have.

16  Q.   And do you recall what month that you began drafting the

17  search warrant affidavit that's Exhibit A in this case?

18  A.   The end of June.

19  Q.   And this search warrant was for 22 cell phones; is that

20  right?

21  A.   Yes, sir.

22  Q.   Okay.  In your entire law enforcement career, have you

23  ever done a search warrant for 22 cell phones before?

24  A.   No.

25  Q.   And you've done a number of search warrants for cell

1    phones in your career; correct?

2    A.   Yes.

3    Q.   Did -- let's talk about the drafting of that.

4         Given the complexity of the investigation which you

5    described and the number of cell phones, did that play into the

6    time it took to draft this affidavit?

7    A.   Yes, sir.

8    Q.   What were some other factors that caused the drafting of

9    this affidavit to be a little bit longer than normal?

10   A.   One of the things was Agent Jaskolka was on the way out.

11   And while I am seasoned in narcotics work, working with the DEA

12   is a difference from working with CNT.  So there's new systems

13   I had to learn, new reports, things of that nature.

14        Additionally, I have extra cases.  This isn't the only

15   case I'm assigned.  So I have other case activities as well as

16   other people in my office who work -- you know, rely on me to

17   help them with their cases and their -- you know, things they

18   have to do to further their case.

19   Q.   Okay.  And even discussing the -- within the affidavit

20   itself, you discuss, kind of, the overall years' long nature of

21   this conspiracy; right?

22   A.   Yes.

23   Q.   And did that factor into the amount of time it took to

24   draft this?

25   A.   Yes.

1    Q.    And were all of the cell phones -- the 22 cell phones that

2    are mentioned in this affidavit, were they all recovered at the

3    same time, at the same time location?

4    A.    No.

5    Q.    Can you talk a little bit about that?

6    A.    Yes.  The multiple search warrants that were conducted

7    through the beginning of March is where the accumulation of the

8    phones came, some from the day of the stop on the 5th.  Later,

9    there were some recovered on the 6th during search warrants,

10   obviously, search warrants of vehicles in the following days.

11   So they were collected over a period of time.

12   Q.    And collected by different agents and officers?

13   A.    Yes.

14   Q.    From different people?

15   A.    Correct.

16   Q.    And even from different counties; correct?

17   A.    Yes.

18   Q.    And does that add to the complexity?

19   A.    It does.

20   Q.    Why is that?

21   A.    It's just different jurisdictions.  Originally, CNT was

22   kicking around just doing a search warrant on their own accord.

23   But when adding different municipalities, you know, it kind of

24   creates a conflict with things, with getting different --

25   multiple warrants signed.

Q.   And even in drafting the warrant, when it's found in
different times, from different places, and from different
people, does that create difficulty in gathering all the
information necessary to put in the affidavit?

A.   Yes.

Q.   And you had to figure out, I guess, the who, what, when,
where, and why on these phones; right?

A.   Correct.

Q.   Did this investigation involve more than one agency?

A.   It did.

Q.   Do you recall some of the agencies that were involved in
this investigation?

A.   Yes, the U.S. Postal Service, obviously CNT.  I believe
the FBI had some information and some hand in it as well.

Q.   And the DEA?

A.   Yes, DEA.

Q.   Savannah PD?

A.   Correct.

Q.   And did you have to talk to a number of agents to draft
the affidavit?

A.   I did.

Q.   Look at multiple different documents?

A.   Yes.

Q.   You mentioned it a little bit, but can you talk about why
the decision was made to consolidate this into one search

1    warrant as opposed to 22 or 20-some different warrants?

2    A.    Yes.  We just believed that that would consolidate, to

3    have them all in one instead of making multiple trips, you

4    know, to a judge, to different courts, to have one affidavit

5    containing all phones, one trip.

6    Q.    And during this time, you were also in discussion with the

7    U.S. Attorney's Office regarding the drafting of the search

8    warrant affidavit?

9    A.    Yes.

10   Q.    And these phones, you know, weren't going to be returned

11   to these individuals; correct?

12   A.    Correct.

13   Q.    Because they had evidentiary value?

14   A.    Yes.

15   Q.    Now, in the course of responding to Mr. Williams' motions

16   and in preparing for this hearing, did you discover some

17   typographical errors in the search warrant affidavit?

18   A.    I did.

19   Q.    All right.  So let's turn to Paragraph 17 of Exhibit A.

20          THE COURT:  Mr. Howard, do you have a copy of

21   Exhibit A for me?

22          MR. HOWARD:  Yes, Your Honor.  It's -- I'm happy to

23   provide my copy.  I'd also note that it's the same Exhibit A

24   that was provided -- or that was filed, attached to our

25   response.  But I'm certainly happy to provide a copy to the

58

1  Court.  And actually, in fact, I have a copy of all the . . .

2          THE COURT:  Just give it to Ms. Flanders.

3          MR. HOWARD:  Okay.

4          THE COURT:  Thank you so much.  Please continue.

5  Sorry to interrupt.

6  BY MR. HOWARD:

7  Q.   Okay.  So we were talking about -- and now you're on

8  Paragraph 18.

9       Can you identify that error for the Court?

10 A.   Yes.  I referred to Device 1 when it should have been

11 Device 14.

12 Q.   All right.  And is that in the last sentence of

13 Paragraph 18?

14 A.   Correct.

15 Q.   And -- so that should be Device 14; correct?

16 A.   Yes.

17 Q.   Do you recall when you were alerted to this error?

18 A.   When we -- when I was meeting with you.

19 Q.   Okay.  And after Mr. Williams had filed his motion;

20 correct?

21 A.   Yes.

22 Q.   And turn to Paragraph 22.

23      And before that, Paragraph 18, any other errors in that

24 paragraph that you're aware of?

25 A.   No.

1   Q.   So go to Paragraph 22.

2        Do you see a reference to Device 14?

3   A.   Yes.

4   Q.   Can you talk about what the errors were on Paragraph 22?

5   A.   Yes.  It should have been Device 1.

6   Q.   Okay.  Is this specifically for the first sentence of

7   Paragraph 22?

8   A.   Yes.

9   Q.   Okay.  So it -- tell me how the first sentence should

10  read.

11  A.   On March 6, 2018, law enforcement obtained a search

12  warrant for Williams' Corolla and found Device 1.

13  Q.   Okay.  There's a -- two additional references to

14  Device 14, I guess, in the third sentence of Paragraph 22.

15       Are those, in fact, correct references to Device 14?

16  A.   Yes.

17  Q.   Okay.  So the only incorrect reference is where that --

18  the -- Device 1 and Device 14 were found?

19  A.   Correct.

20  Q.   Was -- were these intentional errors?

21  A.   No.

22  Q.   And how did -- that kind of transposition error, how did

23  that happen?

24  A.   Just mistake.

25  Q.   And are you relying on information provided by other

1  agents?

2  A.   I am.

3  Q.   Were you relying on information from other agents

4  regarding the serial numbers as well?

5  A.   Yes.

6  Q.   And in light of the transcription error, did I ask you to

7  double-check the serial numbers for all the devices?

8  A.   Correct.

9  Q.   Okay.  And what, if any, errors did you notice in the

10  serial numbers?

11  A.   I found -- excuse me -- three errors in the serial

12  numbers.

13  Q.   Okay.  If you could, just explain what those are.

14  A.   In Device 3, the serial number, there's an extra 5 added

15  that shouldn't be there.  And then in Device -- what's referred

16  to as Device 7, there's an extra 1.  And then in Device 14,

17  there's a 8 that's missing between the -- it should be

18  3-8-7-Bravo.

19  Q.   Did you check all the other devices?

20  A.   I did.

21  Q.   Okay.  And were -- in checking -- double-checking the

22  accuracy of those devices, were the serial numbers correct?

23  A.   Yes.

24  Q.   Did I also ask you to double-check the accuracy of where

25  all the other devices were found?

61

1   A.   You did.

2   Q.   And what did you find with respect to that?

3   A.   It was accurate.

4   Q.   You mentioned that these errors were not intentional.

5        Did you knowingly make these errors?

6   A.   No.

7            MR. HOWARD:  I have no further questions for this

8   witness, Your Honor.

9            THE COURT:  Mr. Withers, any cross?

10           MR. WITHERS:  Yes, Your Honor.

11                           CROSS-EXAMINATION

12  BY MR. WITHERS:

13  Q.   Agent Ripley, good afternoon.  I'm Tom Withers.  I think

14  we've met before.

15  A.   Yes, sir.

16  Q.   I just have a few questions for you, sir.

17       You described this investigation as a complex

18  investigation.

19       Fair to say that you had a dozen or more agents, officers

20  working on this case during the course of the investigation;

21  true?

22  A.   Yes, sir.

23  Q.   And as I understand it, there were at least two lawyers

24  that you worked with at CNT, a Mr. Johnson and a Mr. Heath,

25  that were actively involved in the case; true?

1   A.   Yes, sir.

2   Q.   And at the time of the seizures that occurred on March 5

3   and March 6, Mr. -- Assistant District Attorneys Johnson and

4   Heath were actively involved in the case; true?

5   A.   Yes, sir.

6   Q.   As I understand it, Agent Ripley, Mr. Johnson and

7   Mr. Heath are both detailed to CNT; is that right?

8   A.   Yes, sir.

9   Q.   And at that point in time, CNT was working this case in

10  conjunction with the local DEA and other agencies; true?

11  A.   Yes, sir.

12  Q.   Now, you talked about, you know, one of the things that

13  y'all relied upon in this case is location data, I think is the

14  way you described it; true?

15  A.   Yes, sir.

16  Q.   And you got that location data as a result of the PRRT

17  [sic], pen register/trap and trace device, and applications and

18  orders; true?

19  A.   Yes, sir.

20  Q.   And as I understand it, Agent Ripley, that location data

21  allows agents to track real -- in real time someone's physical

22  location; true?

23  A.   Yes, sir.  It depends if you have a -- yes, that's

24  correct.

25  Q.   Okay.  And you've been involved, Agent Ripley -- you've

1    been working with the DEA for several years and have been

2    tasked over to -- you've been working with the DEA as a task

3    force officer for some time, have been working for the CNT for

4    several years; true?

5    A.    Yes, sir.

6    Q.    You've been involved in cases where GPS tracking devices

7    have been installed on someone's car, for instance; true?

8    A.    Yes, sir.

9    Q.    And that allows you to track that car in real time; true?

10    A.    Correct.

11    Q.    Similarly, here, the cell phone location data allows you

12    to track that cell phone location physically in real time;

13    correct?

14    A.    Yes, sir.

15    Q.    As -- very much as the GPS tracking device that you

16    install on someone's car except you're just tracking the cell

17    phone in this instance; true?

18    A.    Yeah.  It just -- if I could add, it depends on if you

19    have a GPS order with the -- if you're receiving GPS alerts on

20    the phone, that's more specific.  Some of the PRTTs just come

21    with tower triangulation, which means it's just kind of a --

22    it's a -- it's not as specific as GPS, so it could just be a

23    section of town or a side, depending on what tower it's sitting

24    on.

25    Q.    Thank you for that clarification.

1    One of the things that y'all requested in the PRRT [sic]

2 application and the orders was -- it actually mentions the term

3 "GPS"; true?

4 A.    Correct.

5 Q.    Now, you talked about the complexity of the investigation.

6 The case was first indicted on the state side.  The

7 investigation --

8     That is through Chatham County Superior Court; right?

9 A.    Yes.  Yes, sir.

10 Q.    And that case was proceeding along for a couple of months

11 before the federal indictment was returned; true?

12 A.    Yes, sir.

13 Q.    And the federal indictment was returned on June 6 of 2018;

14 true?

15 A.    I believe it's the 6th, yes.

16 Q.    Okay.  The record will reflect --

17 A.    Okay.

18 Q.    -- that.  I think I'm accurate in representing that.

19     The application for the cell phones here was not made

20 until -- July 25, I think, is when you went before Judge Smith

21 and swore out that affidavit --

22 A.    Yes, sir.

23 Q.    -- is that correct?

24     So that the actual warrant -- application warrant here was

25 not returned until -- or was not sought until 6 weeks after the

1    federal indictment; true?

2    A.    Yes, sir.

3    Q.    And those phones -- all of the 22 phones had been in

4    the continuous possession of CNT from the date of seizure in

5    March, March 4th, March -- excuse me -- March 5, March 6;

6    correct?

7    A.    Yes, sir.

8    Q.    Now, you've talked about the errors that were made in

9    Paragraphs 18 and 22.

10         With respect to Paragraph 18, if I can just ask you for

11   a moment where -- you wrote at the last clause of the last

12   sentence on Paragraph 18, quote, Law enforcement seized

13   Device 1 from Mr. Williams -- or from Williams -- excuse me --

14   end of quote.

15        What was the source document that you relied upon in

16   drafting that statement there?

17   A.    I believe it was Agent Brent's -- Minton's report.  It was

18   either that or the evidence receipts from CNT.

19   Q.    And when you're talking about CNT evidence receipts, what

20   kind of evidence receipts does CNT use?

21   A.    It's basically where they're -- the evidence is checked

22   in.  It's how it's cataloged.

23   Q.    Okay.

24             MR. WITHERS:  May I approach, Your Honor --

25             THE COURT:  You may.

1          MR. WITHERS:  -- and retrieve an earlier identified

2    exhibit?

3          And can I stand here for one moment, Your Honor?

4          THE COURT:  Yeah, you may to compare the exhibit with

5    the witness.

6          MR. WITHERS:  Okay.

7    BY MR. WITHERS:

8    Q.   And, Agent Ripley, I'm showing you what's been marked as

9    Government's Exhibit Z.

10         Do you recognize that document?

11   A.   Yes, sir.

12   Q.   All right.  Look at Page 2 of that document, top of the

13   page, second entry.

14         Do you see that?

15   A.   Yes, sir.

16   Q.   Okay.  Is that the -- is this the document that you're

17   describing when you talk about a CNT evidence log?

18   A.   No, sir.  It was the -- you have to bear with me.  They

19   were changing systems right as I came over from CNT, so I can't

20   remember if it was this one or if it was the -- under the old

21   one, but I believe it was this one.

22   Q.   All right.  Well, let me -- I'll tell you a little bit

23   about my experience, and we'll see if we can get on the same

24   sheet of music here.

25   A.   Uh-huh.

1   Q.   So I'm used to seeing an evidence receipt or a property

2   receipt when an agent takes something from someone that's of

3   evidentiary value.  It's either called an evidence receipt or a

4   property receipt at the top of the page.

5   A.   Huh-uh.

6   Q.   You're familiar with that document; right?

7   A.   Yes.

8   Q.   And what that allows law enforcement to do is to come back

9   months later and say, you know, Officer Jane Smith seized from

10  Mr. John Doe on March 5 these four items?

11  A.   Uh-huh.  Correct.

12  Q.   You're familiar with those property receipts or evidence

13  receipts; correct?

14  A.   Yes, sir.

15  Q.   And so my question is -- and by the way, if you look at

16  Exhibit Z --

17  A.   Uh-huh.

18  Q.   -- this doesn't identify who, for instance, the seizing

19  agent might be; right?

20  A.   Correct.

21  Q.   It doesn't tell you the date of the seizure; correct?

22  A.   Yes.

23  Q.   It doesn't tell you the location of the seizure; correct?

24  A.   Yes.

25  Q.   So this clearly can't be the source document that you

1    relied upon in drafting your affidavit; true?

2    A.    Correct.

3    Q.    All right.  And so back to my question then, what source

4    document did you rely upon in drafting Paragraph 18, last

5    sentence?

6    A.    I believe it was Agent Minton's report, but I can't be

7    certain.  I can't remember.  I don't recall.

8    Q.    Okay.  I know it's a bad day when you find out you've made

9    a mistake in a --

10   A.    Yeah.

11   Q.    -- in a sworn affidavit, but when you discovered that, you

12   know, goodness gracious, I made a mistake and transposed these

13   numbers on Device 1 and 14, did you go back and look at those

14   source documents again?

15   A.    I went, actually, back and handled the physical property.

16   So we went to the CNT evidence room and looked at the actual

17   devices.

18   Q.    And tell me about that.  What does that tell you, that you

19   look at the actual devices?

20   A.    Just confirmed that it's the correct serial numbers and

21   then, again, look at the location where they were seized from.

22   Q.    When you go back and look at the actual devices, that

23   doesn't tell you the information that you need with respect to

24   who that item is seized from, or does it?

25   A.    We actually access -- I don't -- this doesn't look to

1    appear.  But yesterday, myself and Agent Jarriel sat in front

2    of the computer and pulled this up, a version of this, on the

3    computer and looked at the seizing location for where each

4    device was and confirmed that each device was, in fact, where

5    we had -- where it was in the warrant.

6    Q.   All right.  And so just let me drill down on that a

7    second.

8         You're referring to Exhibit Z as you're testifying;

9    correct?

10   A.   I don't know, because Agent Jarriel was the one accessing

11   the database.  I can't say that it's this copy, but it's a --

12   their system that logs evidence.

13   Q.   Well, let me ask you this way.  When you go back and you

14   look at the physical item of evidence, that a ZTE cell phone --

15   when you look at that physical item of evidence, is there a

16   property receipt with that physical item of evidence?

17   A.   There would be.

18   Q.   Was there?

19   A.   There's a -- I think there's a chain of custody.  There's

20   a -- there is a chain of custody.  But we were in the presence

21   of the evidence custodian --

22   Q.   Uh-huh.

23   A.   -- so there was no entry into the chain of custody as it

24   didn't leave his sight.  So, yes, there is a evidence form -- a

25   property form.

1   Q.   Okay.  All right.  Yeah.  And I don't mean to be
2   complicated, but I want to make sure we're precise here.
3   A.   Uh-huh.
4   Q.   With the physical item of evidence, the ZTE cell phone in
5   this instance --
6   A.   Uh-huh.
7   Q.   -- is there a chain of custody form with respect to that
8   particular item?
9   A.   I didn't see it, but just standard practice, yes.
10  Q.   Right.  I mean, that's what I would expect is --
11  A.   Okay.
12  Q.   -- that there would be.
13  A.   Right.
14  Q.   Do you remember looking at the physical item that has a
15  chain of custody form for either of these phones that are in
16  question here?
17  A.   No, I did not.
18  Q.   All right.  With respect to -- by the way, that chain of
19  custody form would be a source document that you could rely
20  upon in drafting this; correct?
21  A.   But I haven't in the past, no.
22  Q.   Let me ask you a little bit more precisely.
23       If you wanted to be certain of what item was seized from
24  whom, when, you would look at the chain of custody form for
25  that information?

1    A.    You could, yes.

2    Q.    All right.  And finally, Agent Ripley, turning to

3    Paragraph 22 of your report, what source document did you rely

4    upon in writing that "Also on March 6th, 2018, law enforcement

5    obtained a search warrant for Williams' Corolla and found

6    Device 14"?

7         What source document did you rely upon in writing that?

8    A.    Again, I believe it was one of the agents' reports.

9    Q.    Is it fair to say, then, in drafting the affidavit that

10   you did not look at any of the chain of custody forms --

11   A.    Correct.

12   Q.    -- with respect to -- (inaudible).

13   A.    Oh, I'm sorry.

14   Q.    That's all right.

15        Is it fair to say that, in drafting the affidavit, you

16   did not look at any of the chain of custody forms for these

17   physical items?  Is that true?

18   A.    Yes.

19             MR. WITHERS:  If I could have one moment, Your Honor.

20             THE COURT:  You may.

21             MR. WITHERS:  I think that's all the questions I

22   have.  Thank you, Agent.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Any redirect, Mr. Howard?

25             MR. HOWARD:  Yes, Your Honor.

72

REDIRECT EXAMINATION

1

2     BY MR. HOWARD:

3     Q.   Agent, there was a number of discussions about source

4     documents that you looked at, but you also talked to other

5     people; correct?

6     A.   Yes.

7     Q.   You talked to agents, a number of (inaudible) individuals

8     who were involved in this investigation kind of coalescing

9     this --

10    A.   Correct.

11    Q.   -- information; correct?

12         To your knowledge, has -- all the inventory forms,

13    property forms, receipt forms, has that been provided to our

14    office and produced in discovery?

15    A.   Yes, sir.

16         MR. HOWARD:  No further questions for this witness,

17    Your Honor.

18         THE COURT:  All right.  Mr. Ripley, you may step

19    down.  You're excused.  I'd ask you to please stay outside of

20    the courtroom.

21         THE WITNESS:  Yes, sir.  Thank you.

22         THE COURT:  Mr. Howard, any other evidence from the

23    Government?

24         MR. HOWARD:  Oh, one more witness for this matter,

25    Your Honor, and that would be the -- Agent Kevin Jarriel.

1      (Kevin Jarriel entered the courtroom.)

2          COURT CLERK:  Sir, you have previously been sworn.

3      If you would, please be seated.

4          State your name and your occupation for the record.

5          THE WITNESS:  Good morning.  My name is

6      Kevin Jarriel, currently assigned to the Counter Narcotics Team

7      here in Savannah and currently assigned as a TFO with the DEA

8      from CNT.

9                          KEVIN JARRIEL,

10     having been previously sworn, was examined and testified as

11     follows:

12                      DIRECT EXAMINATION

13     BY MR. HOWARD:

14     Q.   And, Agent Jarriel, you're familiar with this

15     investigation?

16     A.   Yes, sir.

17     Q.   And you participated in this investigation a lengthy

18     amount of time; correct?

19     A.   Correct.

20     Q.   You submitted, I believe, just about all of the pen

21     register/trap and trace orders, the search warrants to obtain

22     the cell site location information in this case; correct?

23     A.   That's correct.

24     Q.   Now, you just heard testimony from Mr. Ripley -- from

25     Agent Ripley regarding GPS and cell site location information;

1  correct?

2  A.   That's correct.

3  Q.   Are you familiar with what's been discussed today as

4  Device Number 1?

5  A.   Yes, sir.

6  Q.   And that, if you look in front of you, is described in

7  Exhibit A -- correct? -- Device Number 1?

8  A.   Correct.  That is the LG Verizon phone.

9  Q.   Let me ask you:  The day of Mr. Williams' arrest, was --

10  did law enforcement have GPS data on that phone?

11  A.   On the Verizon phone?

12  Q.   Device Number 1, correct.

13  A.   No, sir.  That number had been inactive for a while

14  according to the pen register/trap and trace data.

15  Q.   Okay.  And the order authorized -- that you obtained from

16  the Court for Device Number 1 authorized GPS; correct?

17  A.   Correct.

18  Q.   But you weren't receiving GPS data from that phone; right?

19  A.   That's correct.  Verizon does not offer any GPS functions.

20  It offers cell site, but no GPS.

21  Q.   Okay.  And when you talk about cell site, what are you

22  referring to?

23  A.   As Agent Ripley had mentioned, cell site is a large --

24  a larger diameter of what information we could receive.  It's

25  generally several miles.  Sometimes, it's smaller, you know,

1    several hundred feet.  But it is a very broad spectrum of

2    location information that we're given.

3              MR. HOWARD:  And, Your Honor, if I could approach.

4              THE COURT:  You may.

5    BY MR. HOWARD:

6    Q.   Agent Jarriel, I'm handing to you -- or directing to your

7    attention what's been marked as Government's Exhibit Number U

8    that was submitted in response to the Government's response to

9    the CSLI suppression hearing.

10             MR. HOWARD:  I'm happy to provide a copy of those

11   exhibits to the Court as well.

12             THE COURT:  Please.

13   BY MR. HOWARD:

14   Q.   Do you recognize what's been marked as Exhibit U?

15   A.   Yes, sir, I do.

16   Q.   What is that?

17   A.   It's several of our documents there at CNT for what looks

18   to be wiretaps and pen register/trap and trace orders.

19   Q.   Okay.  And does that include the documents concerning

20   the acquisition of cell site location information for Device

21   Number 1?

22   A.   Yes, sir.  You have to give me a minute to find it here.

23        Yes.  As you're referring to Device Number 1, Cellular

24   Number (678) 333-4990, I'm looking at the pen register/trap and

25   trace affidavit.

1    MR. HOWARD:  Okay.  And I move to admit Government's

2  Exhibit U.

3    MR. WITHERS:  No objection.

4    THE COURT:  Exhibit U is admitted without objection.

5  BY MR. HOWARD:

6  Q.   Agent, were you the one that did the -- executed the

7  search of Mr. Williams' Toyota -- the Toyota Corolla that

8  Mr. Williams was seen driving on March 5th, 2018?

9  A.   Correct, sir.

10  Q.   And did you find a phone in that -- in the course of that

11  search?

12  A.   I did, sir.

13  Q.   And is that phone described as Device Number 1 in

14  Government's Exhibit A?

15  A.   Correct.  Ultimately, we were able to identify it as

16  Device Number 1.

17    MR. HOWARD:  And if I could approach, Your Honor.

18    THE COURT:  You may.

19  BY MR. HOWARD:

20  Q.   Agent Jarriel, I've handed you what's been marked as

21  Exhibits E and F in response to Mr. Williams' phone

22  suppression.  I'd ask you to review those.

23  A.   (Complied.)  Okay.

24  Q.   And what is Exhibit E?

25  A.   Exhibit E, this is the search -- state search warrant done

1  for the 2016 Audia -- or -- excuse me -- Audi vehicle as well

2  as a 2016 Toyota Corolla.

3  Q.   And what is Exhibit F?

4  A.   Exhibit F is the return for that search warrant.

5  Q.   And does Exhibit F list that same device that is listed

6  as Exhibit -- or as Device 1 in Exhibit A, the search warrant

7  affidavit?

8  A.   That's correct.  Item Number 2, one Verizon LGE [sic] cell

9  phone.

10  Q.   And you prepared the affidavit for the search warrant,

11  Exhibit E; correct?

12  A.   Yes, sir.

13  Q.   And you did the return for the exhibit?

14  A.   Yes, sir.

15  Q.   You did the return that's reflected in Exhibit F?

16  A.   Correct, sir.

17       MR. HOWARD:  I'd move to admit Exhibits E and F.

18       MR. WITHERS:  No objection.

19       THE COURT:  Without objection, Exhibits E and F are

20  admitted.

21  BY MR. HOWARD:

22  Q.   Now, those -- Agent Ripley talked about property receipts,

23  chain of custody, evidence forms.

24       Are you familiar with CNT's evidence forms?

25  A.   Yes, sir.

Q.   Can you talk a little bit about, you know, the forms
reflecting the seizure of Mr. Williams' devices in this case?
A.   That's correct.  It's a computer system that we use.
We'll input the location where it's found, particularly serial
numbers, owner, and usually, it'll generate the time that it's
logged.  And that's something that we'll print with the case
file.

      So there is no handwritten property receipt or anything
given to any of the people that -- persons that are arrested.
It's just what we log.  And it's either -- some of it's deemed
as the person's property or what will be in -- evidentiary.
Q.   Is there any chain of custody form that you're aware of
that CNT typically uses for phones found in --
A.   It's no different than any other evidence that we would
seize.  We'll put it in a bag, seal it.  There's a sticker on
the front that we just write the case number on -- that way,
the property manager can find where it is -- the logging agent,
suspect, location that it was seized.  And that will generally
reflect what was on the evidence sheet that we have.
Q.   Okay.  And the evidence sheet -- I direct your attention
to Exhibit Z.  And I'm happing to approach to point you to
where --
A.   Please.
            THE COURT:  You may.
                        (No omissions)

1   BY MR. HOWARD:

2   Q.   Well, looking at Exhibit Z, do you recognize that?

3   A.   I do, sir.

4   Q.   What is that?

5   A.   It's various items that were taken during the

6   investigation.  I'm seeing things from Mr. Swinton to include

7   one of the devices in question, Device 14.

8   Q.   Okay.  And is Device 1 listed on there as well?

9   A.   That's correct, sir.  HWRR-N-2 is the --

10  Q.   Okay.

11  A.   -- exhibit number.

12  Q.   And that Device 1 was found in the Toyota Corolla;

13  correct?

14  A.   That's correct, sir.

15  Q.   The Toyota Corolla, was that registered to a

16  Latisha (phonetic) Williams?

17  A.   Yes, sir.

18  Q.   And in the course of the investigation, have you learned

19  whether that cell phone was locked or unlocked at the time that

20  it was found?

21  A.   It was powered off; however, from what I understand, it

22  was unlocked or able to access it with our retrieval machine

23  that extracts cell phone information.

24  Q.   Okay.  And Agent Ripley described a number of individuals

25  that he talked to in preparing the search warrant affidavit.

1    Did you discuss this case with him?

2  A.   Yes, sir, in depth.

3  Q.   Did you knowingly provide him any false information?

4  A.   No, sir.

5  Q.   In the -- what's been admitted as Exhibit U, those

6  affidavits to obtain the cell site location information, were

7  you in consultation with the district attorney's office

8  regarding the submission of those?

9  A.   Yes, sir.

10  Q.   Were you aware of any controlling or binding authority

11  that disallowed the obtaining of cell site location information

12  through the mechanism that was submitted to the (inaudible)?

13  A.   No, sir.  The way I understood it is we're able and

14  allowed and authorized to obtain that information through our

15  court orders.

16        MR. HOWARD:  I have no further questions for this

17  witness.

18        THE COURT:  Thank you.

19        Mr. Withers?

20        MR. WITHERS:  Yes, just briefly on that last two

21  points.

22                    CROSS-EXAMINATION

23  BY MR. WITHERS:

24  Q.   Agent Jarriel, good morning.

25  A.   Good morning, sir.

1    Q.    A couple of questions in follow-up.

2          With respect to Exhibit Z that you have in front of you

3    there --

4    A.    Yes, sir.

5    Q.    -- all right? -- that two-page document, turning to the

6    second page where it identifies the ZTE cell phone, you had

7    talked about an evidence form that would, as I understand it,

8    reside with the actual evidence itself.

9          Do I have that correct?

10   A.    It's not necessarily a form.  It's a sticker that goes on

11   there -- on the bag.  It's not a printable form.  It's not

12   something that we'd take anywhere other than what's on the bag.

13   It's just mainly for the evidence custodian to be able to

14   identify what case it came from, who the seizing agent was,

15   time, date, and who would be the witnessing agent for the

16   sealing of the evidence item.

17   Q.    Okay.  All right.  You would agree with me that Item

18   Number 2, Page 2, Exhibit Z doesn't tell you who the seizing

19   agent was, where it was seized from; true?

20   A.    This does not reflect it, no, sir.

21   Q.    Okay.  And then second issue, with respect to Exhibit U,

22   which is a composite exhibit of the PRRT [sic] and, I think,

23   wiretap applications, as you testified, those were drafted in

24   conjunction with -- or drafted by the CNT -- two CNT lawyers,

25   Mr. Heath and Mr. Johnson.

1    Their names appear on those applications, do they not?

2  A.   Yes, sir, they do.

3  Q.   And, in fact, it appears that the orders themselves were

4  prepared by either Mr. Heath or Mr. Johnson that were submitted

5  to -- I think it was -- is Judge Bass predominantly in superior

6  court; is that right?

7  A.   That's correct, sir.

8            MR. WITHERS:  Thank you, sir.

9            THE COURT:  Any redirect?

10           MR. HOWARD:  No, Your Honor.

11           THE COURT:  All right.  You may step down,

12  Mr. Jarriel.

13           THE WITNESS:  Thank you, Judge.

14           MR. HOWARD:  Your Honor, that's all the witnesses the

15  Government has.  And I think, at the end there, we covered the

16  other motion dealing with cell site location information, so

17  we don't intend to call my other witnesses dealing with the

18  challenge to that motion.  I don't know if Defense Counsel has

19  any witnesses.

20           MR. WITHERS:  No witnesses for this matter,

21  Your Honor.  And I agree with Mr. Howard that -- with respect

22  to the wiretap and PRRT [sic] issue, that the Court judges

23  those on the four corners of the submissions.

24           THE COURT:  Any additional argument from either party

25  as we wrap up these motions?

1          MR. HOWARD:  Well, Your Honor, I just --

2   housekeeping.  I do want to ensure -- I know Mr. Withers

3   doesn't want to do, kind of, a wholesale admission, but I want

4   to ensure that all of the applications, orders, state court

5   applications, state court orders are admitted so that the Court

6   can properly consider those.

7          And we -- it's now been admitted as Exhibit U, which

8   is all of the affidavits.  I wonder if I could just have a

9   minute to go through to see -- to specify, you know, which ones

10  are those applications and orders so we can get those in.

11         MR. WITHERS:  One, I think they are all submitted in

12  our papers, Your Honor, as a composite exhibit as well, and

13  I'm -- I think they're actually attached in a couple of places,

14  and so I have no objection to the Court's --

15         THE COURT:  Wholesale admission?

16         MR. WITHERS:  -- wholesale admission of the PRRT

17  [sic] applications, orders, and the wiretap applications and

18  orders.

19         THE COURT:  And also the suppression hearing phone --

20  also the exhibits and the suppression hearing phone as well?

21         MR. WITHERS:  Yes.

22         THE COURT:  All right.  What I'm going to do just --

23  I've reviewed these documents.  I think they're all admissible

24  in both sets.  And so what I'm going to do is with regard to

25  Exhibits A through J that were attached to the Government's

1    suppression hearing, those are admitted.  And similarly,

2    Exhibits A through U on the PRTT, I'm going to admit those as

3    well.

4            MR. HOWARD:  And then there is the Exhibit Z, the

5    evidence form that was --

6            THE COURT:  And I think Z was already admitted --

7            MR. HOWARD:  Yes.

8            THE COURT:  -- of record, but we'll put that down as

9    well.

10            So, gentlemen -- is there any other evidence or

11   argument, Mr. Withers, I guess, on either of your two motions,

12   either the suppression of the cell phone or the PRTT?

13            MR. WITHERS:  Your Honor, I would like to address

14   both issues, if I might, starting with the -- Your Honor, we've

15   just heard the evidence on -- if I can just gather --

16            THE COURT:  Take your time, Mr. Withers.

17            MR. WITHERS:  -- myself here for a second.

18            THE COURT:  Take your time.

19            MR. HOWARD:  And we're addressing both motions;

20   correct?

21            THE COURT:  That's my understanding.  I want to be

22   clear on this.

23            We have heard the evidence on both of your motions

24   besides the *Brady* motion, Mr. Withers; is that right?

25            MR. WITHERS:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. WITHERS:  Your Honor, to put a point to the

3    motion to suppress with respect to the cell phone searches, the

4    Government's evidence with respect to the abandonment issue, in

5    all candor, makes our position difficult on that, and so I'm

6    going to rely on our papers that we submitted with respect to

7    that.

8          On the issue of the suppression of the wire tap, the

9    evidence is establishing -- the Court has before it all of the

10   applications and orders, what have you.  The Court orders that

11   the superior court signed authorized the disclosure of cell

12   site location data, and only those -- there are some, you know,

13   battle in the papers back and forth.  Those are orders.

14   They're not warrants.  And they don't -- and they plainly state

15   on them that they're orders.

16          THE COURT:  Mr. Withers, can I ask you a question

17   about that?

18          MR. WITHERS:  Yes.

19          THE COURT:  Don't they have the title "Warrant" in

20   the actual heading and title of the document?

21          MR. WITHERS:  It is entitled in the heading of some

22   of those documents, yes.

23          THE COURT:  Okay.

24          MR. WITHERS:  And they are -- they're used to obtain

25   location data, and that location data is then sprinkled

1    throughout the Government's investigation and the wiretap

2    applications.

3         And as to 4990, that's obtained on February 7.  And

4    it, along with Mr. Williams' declaration, unambiguously, I

5    think, establishes standing.  He would have -- even without the

6    standing, he would have to have -- he would have -- excuse me.

7         Even without the declaration, he would have standing

8    to contest the wiretaps because he's an aggrieved person under

9    the statute because the interception is directed against him,

10   and those wiretap applications set forth that he's a target.

11        Now -- so *Carpenter* is decided June 2018, admittedly

12   after the PRRT [sic] applications, orders, and wiretap

13   applications and orders.  And, quite frankly, I think the

14   question then becomes:  Does good faith -- does the GFE,

15   good-faith exception, save the Government here?

16        And I think the answer to that is no.  As the

17   evidence establishes and as the -- as reflected in the papers

18   generally, those applications are prepared by -- with respect

19   to PRRT [sic], prepared by the CNT lawyer.  The orders are

20   prepared by the CNT lawyer, drafted by a CNT lawyer, and

21   submitted to the superior court, who signs them.

22        And in *Carpenter*, the Supreme Court recognizes

23   that -- I think, that digital is different.  And Page 2218 of

24   *Carpenter*, they talk about that historical cell site records

25   present even greater privacy concerns than the GPS monitoring

1    in the vehicle, and they cite to the *Jones* case that had been

2    decided earlier -- or discussed earlier, decided in 2012.

3           And *Jones* says for GPS tracking of a -- tracking

4    device for a vehicle, you've got to have a warrant.  And as

5    the Supreme Court notes on Page 2218 of *Carpenter*, when the

6    Government tracks the location of a cell phone, it achieves

7    near perfect surveillance as if it had attached an ankle

8    monitor to the user.

9           And so *Jones* establishes you've got to have a warrant

10   for GPS tracking device.  The PRRT [sic] applications and

11   orders actually talk about GPS location data.

12          And so what does that mean here?  I think that that

13   means that the Government -- and these orders and applications

14   are drafted by the CNT lawyer.  The Government knows you can't

15   install a GPS tracking device.

16          Mr. Heath and Mr. Johnson, they fit -- installed a

17   GPS tracking device without a warrant.  And that's just what

18   the orders that were entered by the Supreme Court allowed them

19   to do here.

20          THE COURT:  Mr. Withers, help me out with something.

21          Is *Carpenter* to be applied retroactively?

22          MR. WITHERS:  That's a little bit more of a difficult

23   question.  We've addressed that in our papers, Your Honor, but

24   I don't think -- I don't think we get a blanket application,

25   and so I think the Government does get to say, you know, "Hey,

we're entitled to good faith."  But -- and that's the reason
why I concentrated my argument on good faith based on *Jones*'
2012 decision.  CNT Lawyers know you can't do the GPS tracking
without a warrant.

THE COURT:  All right.  Thank you, Mr. Withers.

MR. WITHERS:  Thank you, Your Honor.

THE COURT:  Mr. Howard.

MR. HOWARD:  Thank you, Your Honor.  I think this has
been rather helpful in crystallizing some of the issues.  Now
we're down to one device.  Device 14 isn't really at issue
here.

I'm not going to, you know, belabor the point with
respect to the response to the phones.  You know, we would
submit that it was abandoned.  Even if it was abandoned,
looking at those different (inaudible) factors, didn't ask for
it back, wasn't entitled for it back, couldn't get it back.

It had significant evidentiary value in and of itself
regardless.  It wasn't contingent on the down-low or the
abandonment.  And then he gave up any possessory interest that
he had in that device when he fled, when he left the car
running, the keys in it, and the car unlocked and then the
device unlocked, all of those factors.

And we cited to a number of cases.  This isn't the
first time people flee from police and leave incriminating
evidence behind.  So that's -- that's our argument with respect

1   to the phone.

2          I think the cell site location information is one

3   that -- *Carpenter*, frankly, at the end of the day, doesn't

4   matter here.  There's no question that, if we're operating

5   today and if they're getting historical cell site location

6   information, they need to get a warrant.  *Carpenter* makes that

7   clear.  *Carpenter*, however -- and there's no dispute -- wasn't

8   in effect at the time.

9          You know, I -- in looking yesterday to the

10  retroactivity question, I think that some district courts seem

11  to assume without deciding it or -- there's a number that said

12  that it does apply retroactively.  And we're not contending

13  here that there wasn't a Fourth Amendment violation.  We're

14  contending here that, at first, it was a search warrant.  It

15  says it's a search warrant.  Certainly, a search warrant is --

16  means probable cause unless articulated throughout, and there

17  really is no challenge to the probable cause nature of it here.

18          THE COURT:  In fairness, Mr. Howard, let me ask you

19  this question.

20          MR. HOWARD:  Yes.

21          THE COURT:  Clearly, if CNT wanted to apply for what

22  is unambiguously a warrant, they could have done so; right?

23          MR. HOWARD:  They could have, Your Honor, but this

24  isn't that unique.  So this, kind of, hybrid theory isn't --

25  and the hybrid theory being the idea of pen register/trap and

1    trace in compliance with the pen register statute as well as

2    the 2703(d) Stored Communications Act.  Interplay is not

3    unique.

4            In addition to that, they erred on the side of

5    caution and got the search warrant, so it's really -- it's

6    them -- at the time, the law did not require it -- really going

7    above and beyond what they needed to do.

8            I think this is erring on the side of caution, which,

9    certainly, when you're looking at Leon (phonetic), you know,

10   the deterrence effect is not particularly great because, here,

11   you have officers who are not merely complying with the --

12   what the law requires them to, but they're going beyond that.

13   And they're going beyond that at a time when the law didn't

14   require it.

15           I mean, it's undisputed, certainly, in the Eleventh

16   Circuit, with respect to historical cell site, that the law

17   as stated at the time did not require a warrant.  Real-time

18   prospective, a little murkier at the time, still undecided.

19           Counsel talked about *United States v. Jones*.  But

20   courts have repeatedly found that there are substantive

21   differences between placing a GPS tracker on a device, then

22   getting a real-time perspective or even GPS location

23   information.  There's a third-party doctrine that comes into

24   play, the difference between GPS and *Jones* with putting it onto

25   a car.

1        There's also the trespassory action that is inherent

2   with putting a GPS device on a car that does not exist when

3   there is a -- information is provided to the provider and then

4   obtained from the provider.  So courts have distinguished GPS

5   as it relates to phone from GPS as it relates to car.

6        But, also, I think Your Honor heard something very

7   important today from Agent Jarriel, is that with respect to the

8   only phone that's outstanding -- that's at issue here is Device

9   Number 1.  Well, Device Number 1, they weren't getting GPS.  So

10  now we're in a question of, basically, cell site location

11  information meaning cell towers, which are not as precise as

12  GPS.  And so now we're in a -- now we're in, really, a 2703(d),

13  frankly, scenario under the Stored Communications Act.

14       And so when we're looking at Leon (phonetic), what

15  courts have -- even in this circuit, district courts -- and we

16  cited to a number of them, certainly, *United States v. Booker*,

17  which is a 2013 Northern District of Georgia case

18  prospective -- they authorized prospective under 2703(d) --

19  *United States v. Sarem* (phonetic), which was a Middle District

20  of Georgia 2012 case.  That was (inaudible) obtaining GPS

21  without a search warrant.

22       They have authorized it.  They've authorized it short

23  of a search warrant.  And certainly, there hasn't been any

24  allegation of bad faith or, I think, credible allegation of

25  bad faith.

1          There was a mention today of the fact that other

2   individuals may have prepared the reports.  But as Your Honor

3   knows, there's only one person who makes the ultimate

4   determination in signing that -- we believe it's a search

5   warrant.  They call it an order -- and that's the judge.  It

6   doesn't matter who prepares it.  It matters who signs it.  It

7   matters who makes the ultimate determination, and it matters a

8   great deal when we're talking about the good-faith reliance on

9   what the courts do.

10          So we think, first and foremost, it's a warrant

11  couched in probable cause describing the warrant.  But even if

12  it isn't, the state of the law at the time didn't require a

13  warrant.  They were acting in good faith.

14          And frankly, you know, we -- we addressed standing.

15  I think the arguments are not particularly strong that standing

16  as to Device 1, therefore, crept into every subsequent

17  application and even the wiretap.  It's important to note there

18  was no wiretap for Mr. Williams' phone.  Device 1 was not

19  wiretapped.

20          So I think the idea that it builds upon each other

21  in such a way that it's almost a necessary conclusion as to

22  (inaudible) just isn't supported by the law, nor is it

23  supported by the specific facts of this case.  And I certainly

24  encourage Your Honor to take a look at the applications that

25  were submitted, the search warrant affidavits because I think

1   you can see that that's not the case.

2          So I'm certainly happy to answer any questions.  But,

3   again, this idea that just because *Jones* said GPS is required

4   for a car doesn't necessarily implicate phones as well.  It

5   simply, you know, isn't the case, hasn't been the case, and

6   wasn't the case at the time these things were obtained.

7          THE COURT:  Thank you, Mr. Howard.

8          Mr. Withers, it's your motion if you'd like the last

9   word.

10         MR. WITHERS:  Your Honor, I would just point out

11  this.  With respect to the orders that they submitted -- I

12  mean, at the end of the day, they're Stored Communications Act

13  orders.  Bizarre to me that lawyers who know of *Jones* and know

14  that *Carpenter* is on the horizon would not get a warrant

15  instead of their order.  They went to great lengths in the

16  order to specify exactly what they wanted, including GPS data,

17  and I think that suppression is necessary to vindicate

18  (inaudible).

19         THE COURT:  All right.  Thank you.

20         Gentlemen, anything further on Mr. Williams' matters?

21         MR. HOWARD:  No, Your Honor.

22         MR. WITHERS:  No, Your Honor.

23         THE COURT:  All right.  We're going to take a brief

24  recess, 10 minutes, and then we'll pick up with Mr. Hooper's

25  motion.

94

1          COURT SECURITY OFFICER:  All rise.

2      (Proceedings recessed at 10:57 a.m.)

95

1                         C E R T I F I C A T E

2

3

4          I, Victoria L. Root, Certified Court Reporter, in and for

5    the United States District Court for the Southern District of

6    Georgia, do hereby certify that the foregoing transcript of the

7    proceedings held in the above-entitled matter was transcribed

8    to the best of my ability from the Court's electronic recording

9    system and that the transcript page format is in conformance

10   with the regulations of the Judicial Conference of the United

11   States.

12         WITNESS MY HAND AND SEAL this 31st day of March, 2019.

13

14

15

16

17

18

19

20                         _____

21                         VICTORIA L. ROOT, CCR B-1691
                           United States Court Reporter
                           Southern District of Georgia
22                         Savannah Division

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066